**PEOPLE of the State of Colorado, Plaintiff-Appellant,**

v.

**Henry SAVAGE, Defendant-Appellee.**

**No. 84SA392.**

Supreme Court of Colorado, En Banc.

April 22, 1985.

---

Milton K. Blakey, Dist. Atty., David I. Marsh, Deputy Dist. Atty., Aspen, for plaintiff-appellant.

Kevin O'Reilly, Glenwood Springs, for defendant-appellee.

QUINN, Justice.

The People, pursuant to C.A.R. 4.1, appeal the district court's suppression of a knife seized by a police officer in the course of an investigatory stop of the de-

fendant, Henry Savage, and also a custodial statement made by the defendant after his arrest. The district court concluded that the officer's conduct exceeded the limits of a permissible stop and frisk and constituted an arrest without probable cause, thereby requiring the suppression of both the knife and the defendant's statement as the products of an unconstitutional seizure of the defendant's person. We reverse the order of suppression.

## I.

The defendant stands charged in a two-count information in the District Court of Pitkin County. One count alleges that on October 15, 1983, the defendant committed the crime of felony menacing, in that he threatened or took physical action against Scott Vanderhide by means of a deadly weapon, a knife, and thereby knowingly placed or attempted to place Vanderhide in fear of imminent serious bodily injury.[1] The other count alleges that on the same date the defendant knowingly and unlawfully carried a knife concealed on or about his person.[2] Prior to trial the defendant moved to suppress the knife and a custodial statement made by him at the station house. The only witness testifying at the suppression hearing was Officer Gary Wildebrandt of the Aspen Police Department. Wildebrandt's testimony established the following facts.

In October 1983 the defendant and Scott Vanderhide operated the Oasis Gas Station in Aspen, Colorado, but were engaged in an ongoing conflict over various aspects of the business and were in the process of severing their partnership. On a Saturday morning in early October, about two weeks prior to the incident in question, Officer Wildebrandt was called to the gas station to investigate physical threats made by the partners against each other. Upon arriving at the gas station, he observed that the defendant was holding a folding knife in his hand, but the officer took no official action at this time. Officer Wildebrandt testified that the ongoing strife between the defendant and Vanderhide was a matter of general knowledge among Aspen police officers and that the police had been called to the gas station on several occasions to investigate disputes between the partners. The officer considered the deteriorating relationship between the defendant and Vanderhide as potentially dangerous.

At approximately 9:30 a.m. on October 15, 1983, Officer Wildebrandt received a call from the police dispatcher that a man at the gas station was threatening others with a knife. He arrived at the station approximately two minutes later and observed the defendant outside the station office in an agitated state. Several other persons appeared to be focusing their attention on the defendant at this time. As the officer approached, the defendant walked away from the officer and towards the station office, with his hands in his coat pockets. The officer told the defendant to stop and take his hands out of his pockets, but the defendant disregarded the command and stopped near a gas pump only when another member of the Aspen Police Department, Officer Murray, approached from the opposite direction. When Officer Murray asked the defendant if he had a knife, the defendant made no reply.

Believing that the defendant might be armed with a knife, Officer Wildebrandt decided to search the defendant for a weapon. He asked the defendant if he would consent to a search, and the defendant made no reply. Officer Wildebrandt then told the defendant that he was going to search him,[3] whereupon the defendant re-

---

1. § 18–3–206, 8 C.R.S. (1978).

2. § 18–12–105(1)(a), 8 C.R.S. (1978).

3. Officer Wildebrandt's suppression testimony indicates that the type of search which he intended to perform was a frisk of the defendant's clothing for a weapon:

   Q If Mr. Savage had responded to your request that you be allowed to search his person negatively, that is, said no, what would you have done?
   A I would have still had to do a pat down search for weapons of his outer clothing.

moved his hands from his pockets and placed several items including a folding knife on the top of a gas pump. Officer Wildebrandt seized the knife, while another officer, Sergeant Hamlin, talked to other persons at the scene. A few minutes later Sergeant Hamlin placed the defendant under arrest for menacing and carrying a concealed weapon.

The defendant was then escorted to the police station, where he was advised of his *Miranda*[4] rights by Officer Wildebrandt. The defendant stated that he understood his rights and, without any questioning, told Wildebrandt that upon arriving at the gas station that morning his partner and several other employees began shouting at him, at which point he took out his knife.

In granting the defendant's motion to suppress, the district court ruled that, because Officer Wildebrandt testified that he intended to search the defendant for weapons even if the defendant did not voluntarily consent to a search, the officer at that point had arrested the defendant without probable cause.[5] The court accordingly suppressed both the knife and the defendant's custodial statement as the products of an unlawful arrest unsupported by probable cause. The People claim that the officer's initial encounter with the defendant, including the officer's statement that he was going to conduct a search, constituted a permissible limited intrusion which did not require the existence of probable cause. We agree with the People's claim.

## II.

The district court turned its suppression order on the fact that Officer Wildebrandt told the defendant that he was going to search him notwithstanding the defend-

---

> Q When you say a pat search, what kind of search do you mean?
> A Just his outer clothing, feeling for weapons. I was not going to go into his pockets or do anything, remove any clothing, anything like that.

**4.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**5.** The district court, analogizing Officer Wildebrandt's encounter with the defendant to the case of *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), stated in its ruling as follows:

> It seems to me like you've got the same situation here. First of all, if you ask a person for permission to search, and you're not going to accept no, you say: Will you consent to a search, and you are not going to consent to the answer no, you are not going to take no for an answer, it's not really a question, you've arrested him in my estimation.
>
> If there's nothing he can do short of consent to that search, or go along with it, then there is no consent. Consent has been eliminated, that's what happened here. The officer never asked anybody what was going on, he never did anything to determine that Henry Savage was the source of the problem other than rely on his previous experience. He told Mr. Savage to take his hands out of his pockets, somebody asked him if he had his knife, he replied no.
>
> That's the same thing as in this case here. He said no, but they didn't take no for an answer, they said we are going to search you. At that point they arrested him.

> In my estimation, that was an arrest without probable cause. And the evidence of that arrest is suppressible, notwithstanding the fact that Mr. Savage took it out of his pocket and laid it up there. If you won't take no for an answer, you really haven't asked a question.

The court's analogy to *Royer* is misplaced. In *Royer,* Miami detectives, concluding that Royer fit the "drug courier profile," approached Royer at the Miami International Airport and asked to speak to him and requested his ticket and driver's license. After noting that Royer's ticket, like his baggage tags, bore the name "Holt" and that his driver's license carried the name "Royer," the detectives brought Royer to a nearby room where they asked him if he would consent to a search of his suitcases. Royer produced a key and unlocked one of the suitcases, in which drugs were found. A detective then pried open the second suitcase and more drugs were found. A majority of the Supreme Court concluded that, although the detectives had adequate grounds for temporarily detaining Royer and his luggage, the scope and character of the detention exceeded the permissible bounds authorized by the *Terry* doctrine. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Because the detention itself was violative of the Fourth Amendment, the majority held that Royer's consent to the search of the suitcases was tainted by the illegal detention and thus was ineffective to justify the search. In contrast to *Royer,* as we discuss in some detail in the opinion, Officer Wildebrandt's stopping of the defendant and his initial statements about conducting a search were the limited types of intrusions justified under the *Terry* doctrine.

ant's failure to respond to the officer's initial request to search the defendant's person. In the district court's view, the defendant's refusal to consent thereby converted the initial intrusion into a formal arrest. The court's ruling erroneously confused the question of a refusal to consent with the separate issue of the officer's right to conduct a limited search for weapons during an investigatory stop.

■■■ A consent to search must be voluntary in the sense that it must be the product of a free choice and must not be the result of duress, coercion, threats, or promises that are calculated to flaw the free and unconstrained nature of the decision. *E.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *People v. Elkhatib,* 632 P.2d 275 (Colo.1981); *People v. Hayhurst,* 194 Colo. 292, 571 P.2d 721 (1977). The prosecution has the burden of proving the voluntariness of a consent, and that burden requires more than a mere showing of submission to a claim of lawful authority. *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). The absence of a voluntary consent to search, however, does not transform any ensuing search of the defendant's person into the functional equivalent of a formal arrest requiring the existence of probable cause. On the contrary, as we discuss in Part III, a police officer under certain circumstances may conduct a nonconsensual search for weapons even when probable cause to arrest or search is lacking. Thus, the mere fact that the defendant may have placed the knife on the gas pump as an act of submission to Officer Wildebrandt's statement that he was going to search the defendant's person does not dispose of the issue relating to the legitimacy of the officer's conduct. Rather, the constitutional validity of the officer's conduct must be determined independently of the defendant's failure to consent to a search. It is to that question that we now turn.

### III.

■■■ In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court recognized that under narrowly defined circumstances a police officer may make limited intrusions on an individual's personal security even though probable cause to arrest or search is lacking. The *Terry* principle, which has been applied in a variety of contexts since its promulgation, *see, e.g., United States v. Hensley,* — U.S. ——, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), involves a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). When the nature and extent of the intrusion are minimal, the opposing law enforcement interests in effective crime prevention and detection can support an investigatory stop and limited search on less than probable cause. *Id.*

■■■ We have stated on numerous occasions that three conditions must exist before a person may be subjected to an investigatory stop and a limited search of his person: (1) there must be an articulable and specific basis in fact for suspecting that criminal activity has taken place, is in progress, or is about to occur; (2) the purpose of the intrusion must be reasonable; and (3) the scope and character of the intrusion must be reasonably related to its purpose. *E.g., People v. Carlson,* 677 P.2d 310 (Colo.1984); *People v. Wells,* 676 P.2d 698 (Colo.1984); *People v. Tate,* 657 P.2d 955 (Colo.1983); *People v. Johnson,* 199 Colo. 68, 605 P.2d 46 (1980); *Stone v. People,* 174 Colo. 504, 485 P.2d 495 (1971). The existence of these conditions must be judged against an objective standard that takes into consideration the facts and circumstances known to the officer at the time of the intrusion and evaluates the purpose, scope, and character of the intru-

sion in light of those facts. *See, e.g., People v. Bell,* 698 P.2d 269 (Colo.1985); *People v. Cobbin,* 692 P.2d 1069 (Colo.1984); *People v. Perez,* 690 P.2d 853 (Colo.1984); *People v. Cagle,* 688 P.2d 718 (Colo.1984); *People v. Thomas,* 660 P.2d 1272 (Colo. 1983).

 The record in this case clearly establishes the existence of all three conditions necessary for an investigatory stop and a limited search of the defendant. First, the facts and circumstances known to the officer at the time of the encounter were such as to create a reasonable suspicion of criminal activity on the part of the defendant. Officer Wildebrandt had prior knowledge of ongoing hostility between the defendant and his partner and during a previous investigation of a reported disturbance at the gas station had observed the defendant with a folding knife in his hand. Some two weeks later, on October 15, 1983, after receiving a radio call that a person at the gas station was threatening others with a knife, the officer observed the defendant at the gas station in an excited state with various people focusing their attention on him. These facts warranted an investigatory stop for the purpose of determining whether the defendant was the person who reportedly had been making threats with a knife. Second, because Officer Wildebrandt had reason to suspect that the defendant might be armed and presently dangerous, the purpose of the officer's attempted search of the defendant was an eminently reasonable one—that is, to protect the officer and others from potential violence by the defendant during the officer's on the scene investigation of the reported threat. *See, e.g., Long,* 103 S.Ct. 3469; *Adams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612; *Terry,* 392 U.S. 1, 88 S.Ct.

1868, 20 L.Ed.2d 889; *People v. Lewis,* 659 P.2d 676 (Colo.1983). Finally, the scope and character of the challenged intrusion, which consisted of the officer's initial request to search followed by a statement that he would search the defendant, were reasonably related to the purpose of the investigatory stop. The officer's testimony during the suppression hearing clearly established that if the defendant had expressly refused to consent to a search, the officer intended to pat down the defendant's outer clothing for weapons. *See supra* note 3. This type of pat down or frisk for weapons is the very type of limited, protective intrusion authorized during an investigatory stop when the officer has reason to suspect the person with whom he is dealing might be armed and dangerous. *See, e.g., Long,* 103 S.Ct. 3469; *Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340; *Adams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612; *Cobbin,* 692 P.2d 1069; *Lewis,* 659 P.2d 676.

We thus conclude that, under the totality of circumstances present here, Officer Wildebrandt's stopping the defendant and requesting the defendant to consent to a search followed by the officer's statement that he would search the defendant comported with the three-pronged standard for an investigatory stop and a limited search for weapons. The district court erred, therefore, in suppressing the knife and the defendant's custodial statement as the products of an unconstitutional seizure of the defendant's person.[6]

The order of suppression is accordingly reversed.

---

**6.** The district court's suppression order was based solely on the conclusion that once Officer Wildebrandt, in the face of the defendant's initial failure to consent to a search, told the defendant that he was going to search him for a weapon, the intrusion at that point became a full scale arrest which required the existence of probable cause for its justification. The court accordingly did not address whether Sergeant Hamlin's interviewing of witnesses at the scene while the defendant was detained by Officer Wildebrandt established probable cause for the arrest of the defendant for felony menacing. Because the district court did not consider this aspect of the case, we do not address it in this opinion. Our analysis is confined solely to a consideration of whether Officer Wildebrandt's initial encounter with the defendant constituted a full scale arrest which required probable cause for its justification.