The PEOPLE of the State of
Colorado, Petitioner,

v.

Rafael RODRIGUEZ, Respondent.

No. 96SC230.

Supreme Court of Colorado,
En Banc.

Sept. 15, 1997.

Rehearing Denied Oct. 20, 1997.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney, General, Richard A. Westfall, Solicitor General, John Daniel Dailey, Deputy Attorney General, Robert Mark Russel, First Assistant Attorney General, Roger G. Billotte, Assistant Attorney General, Criminal Enforcement Section, Denver, for Petitioner.

David F. Vela, Colorado State Public Defender, James Grimaldi, Deputy State Public Defender, Denver, for Respondent.

Justice BENDER delivered the Opinion of the Court.

We granted certiorari in *People v. Rodriguez*, 924 P.2d 1100 (Colo.App.1996), to re-

view the judgment of the court of appeals overturning the conviction of respondent Rodriguez for possession of a schedule I controlled substance, heroin.[1] The court of appeals reversed the district court's denial of Rodriguez's motion to suppress, holding that the detention of Rodriguez constituted an illegal arrest which tainted Rodriguez's later consent to search. We affirm the holding of the court of appeals, but we employ different reasoning.

We hold that when an officer possesses reasonable suspicion that a traffic offense has been committed and the officer has decided not to give the driver a ticket for the traffic offense, the officer may request identifying information from the driver, such as a driver's license, vehicle registration, and proof of insurance. We hold this request for information is constitutionally permissible because the officer's conduct is to be evaluated on the basis of an objective standard. The officer's subjective decision not to give a ticket does not strip the officer of legal justification to make further inquiries. The circumstances of this case, that is, minor discrepancies in the van registration and the lack of the Nader safety label on the doorjamb of the van, furnished reasonable suspicion for the trooper to investigate further whether the van was stolen. However, the ninety-minute detention of Rodriguez and the ten-mile forced drive in this case exceeded the permissible parameters of an investigatory stop. The temporary detention escalated into an arrest unsupported by probable cause to believe that the van was stolen, in violation of the Fourth Amendment to the United States Constitution and Article II, Section 7 of the Colorado Constitution. Rodriguez's arrest was illegal. His consent to search was not sufficiently attenuated from this illegal arrest which immediately preceded his consent. Hence, we conclude that the heroin discovered in the search of Rodriguez's van must be suppressed. We affirm and remand to the court of appeals to return this case to the district court for further proceedings consistent with this opinion.

### I.

On September 30, 1992, Rodriguez was traveling east on Interstate 70 (I–70) in his van, accompanied by his pregnant wife, their three toddlers, and a friend named Miguel Munoz. They were returning from Las Vegas, Nevada, to their home in Chicago, Illinois. Rodriguez was born in the Commonwealth of Puerto Rico and speaks little English. Munoz was born in Mexico and is now a resident of Illinois. Munoz is bilingual in Spanish and English.

At approximately 7:25 a.m., as Rodriguez was driving on a winding section of I–70, west of Vail, a Colorado state trooper observed Rodriguez's van weave across the continuous white line on the right shoulder by approximately half the width of the van, then cross over and touch the white-dashed line on the other side of its lane. The trooper followed the van approximately a mile and a half to a straight stretch of highway near the Wolcott exit on I–70. There the trooper stopped the van on the shoulder of the interstate to determine whether the driver was intoxicated.

Upon being told by the trooper that he was weaving, Rodriguez stated that he and his family were driving from Las Vegas to Chicago. He said he was very tired. The trooper testified it was obvious that Rodriguez had not been drinking. The trooper decided that he would not issue a traffic citation to Rodriguez for failure to drive within a single lane (weaving).[2] The trooper requested Rodriguez's driver's license and vehicle registration. Rodriguez produced these documents and the trooper instructed him to wait in the van. The trooper also observed and recorded the van's vehicle iden-

---

1. *See* § 18–18–405, 8B C.R.S. (1996 Supp.).

2. Section 42–4–1007(1)(a), 17 C.R.S. (1996 Supp.), provides:
 A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

tification number (VIN) from the dashboard by looking through the driver's side corner of the vehicle's windshield.

The trooper ran a check on Rodriguez's license, registration, and VIN. The license was valid, the vehicle was properly registered under Rodriguez's name, and the van had not been reported stolen. The VIN on the dashboard matched the VIN on the registration card and showed no signs of alteration or tampering. However, the trooper's examination of the vehicle registration revealed two discrepancies. The registration card indicated that the letters on the van's license plate were "CAW," but the actual letters on the license plate were "CAD." In addition, the registration card indicated that the van was a 1985 model, while the computer check showed that the van was a 1980 model. The registration card was hand written; the trooper testified he gave little weight to the registration because of this fact. Rodriguez also provided the trooper with a document from the Illinois Department of Motor Vehicles concerning his hand-written registration card. At this time, however, the trooper did not read the document and later testified he was under the impression that the paper was a reminder for registrants to check their plates against the card for accuracy.

Because of the discrepancies with the registration the trooper decided to compare the VIN from the dashboard and registration with the VIN on the "Nader Label," which is a sticker that is glued to the doorjamb on the driver's side of an automobile. The trooper testified that this label appears on "99 percent" of vehicles and that it "only takes a couple seconds" to compare the VINs. Without requesting permission, the trooper opened the driver's side door of the van and found that the van did not have a Nader Label.

In the absence of a Nader Label, the trooper wanted to compare another VIN on the van to the VIN from the dashboard and registration card. The trooper was aware that automobile manufacturers often place the VIN in another, inconspicuous location. The trooper did not know the location of the hidden VIN. He believed that a state patrol auto theft specialist in Grand Junction would be able to tell him where the hidden VIN could be found. The trooper did not want to search for the hidden VIN on the shoulder of the interstate because of his concern for his safety and for the safety of the occupants of the van. He decided to conduct further investigation at a better location ten miles west, the state patrol headquarters in Eagle.

The trooper approached Rodriguez, explained the discrepancies concerning the plate numbers and the manufacture date of the van, and requested that Rodriguez follow him to the state patrol office in Eagle, which was ten miles west from where the van was stopped and in the opposite direction from which Rodriguez was traveling. Because Rodriguez was not fluent in English he had difficulty understanding this request. Munoz, who was sitting in the passenger seat, began to interpret. Rodriguez, through Munoz as interpreter, replied that he did not want to follow the trooper to Eagle. Rodriguez said they were too tired and wanted to continue on their way eastward. The trooper told Rodriguez that he would disable and impound the van unless Rodriguez complied with his request to return to Eagle. Rodriguez then agreed to follow the trooper. At this point Rodriguez had been detained for forty-two minutes. The trooper, followed by Rodriguez, left the roadside location at 8:07 a.m. and arrived in Eagle approximately fourteen minutes later, at 8:21 a.m. During this drive, the trooper contacted a second trooper and asked for assistance in Eagle.

At 8:25 a.m. at the patrol headquarters in Eagle, the second trooper assembled a video camera and began videotaping the van and the area around the van. The time and the factual summaries discussed below are based in part upon this video which was introduced as evidence during the hearing on Rodriguez's motion to suppress.

Because it was a cold morning, the first trooper told Rodriguez's wife and their chil-

dren to go to a nearby diner to get warm, but he required Rodriguez and Munoz to remain with the vehicle. While the first trooper went inside the headquarters to telephone the auto theft specialist regarding the location of the hidden VIN, the second trooper remained outside with the van to ensure that Rodriguez and Munoz did not leave. Munoz attempted to explain the discrepancies on the registration card to the second trooper by showing him the notice from the Illinois Department of Motor Vehicles which informed Rodriguez, among other things, that "the license plate number on your current identification card is incorrect." In conversation with Rodriguez and Munoz the second trooper read this notice aloud at 8:32 a.m. but failed to acknowledge that this document explained the one digit difference between the van's plates and the registration card. Instead, the second trooper changed the subject of the conversation by asking both Munoz and Rodriguez their respective countries of birth. When Rodriguez answered that he was born in Puerto Rico, the trooper initially did not recognize that this entitled Rodriguez to United States citizenship.[3]

The first trooper emerged from the headquarters and opened the hood of the van. He quickly located a VIN under the hood which matched the VIN located on the dashboard and the one written on the vehicle registration card. This final match occurred at 8:36, seventy-one minutes after Rodriguez's van was initially stopped on I–70. The first trooper testified that at this point, he was satisfied that Rodriguez was the rightful owner of the van. Nevertheless, the detention of Rodriguez and Munoz, who by this time had been joined by Rodriguez's wife and three children, continued. All waited in the van for an additional fifteen minutes under the supervision of the second trooper while the first trooper returned to the office.

At 8:48 a.m., the first trooper emerged from the office and approached the driver's side of the van with Rodriguez's registration and other documents in hand. The trooper explained that there was an apparent clerical error on the registration card and advised Rodriguez to "get in and get it corrected." He suggested that Rodriguez "talk to someone" about the absence of a Nader Label on the doorjamb. At 8:50 a.m. the first trooper instructed Rodriguez to step out of the van and told Munoz and the others to remain inside the van. Rodriguez was led to the rear of the vehicle, where the two troopers were joined by a third. The three uniformed, armed troopers, considerably larger than Rodriguez, surrounded him in a semicircle. The first trooper returned Rodriguez's documents to him, stating, "I'll let you have all this back," and asked if Rodriguez's wife was "okay." The following exchange then took place:

> Trooper 1: You're free to go now. Would it be all right if we searched your van?
>
> Rodriguez: Pardon?
>
> Trooper 1: Would you mind if we looked in your van for any illegal weapons?
>
> Rodriguez: Sure.
>
> Trooper 1: Would that be okay?
>
> Trooper 2: Contraband, any contraband? Are you carrying any contraband?
>
> Rodriguez: Huh?
>
> Trooper 2: Contraband? Guns?
>
> Rodriguez: No, no.
>
> Trooper 2: Guns?
>
> Rodriguez: No guns.
>
> Trooper 2: No guns?
>
> Trooper 1: Is it okay?
>
> Rodriguez: It's okay.

Rodriguez reached into the van and retrieved the keys from the ignition. He opened the rear door of the van and pushed aside a large stereo speaker which dominated

---

3. Trooper: And what country are you from?
Rodriguez: Uh, Puerto Rico.
Trooper: Puerto Rico.
Rodriguez: Yes.
Trooper: Okay. Are you both ... [to Munoz] is he a resident also?
Munoz: He's a citizen.

Trooper: He's a citizen.
Munoz: An American, yeah.
Trooper: That's right, Puerto Rico is an American possession, isn't it?
Munoz: Yes.
Trooper: I'll be darned.

the entrance to the van. Rodriguez's wife and children were instructed to return to the diner across the street, but the second trooper stated, "He [Rodriguez] stays here with us."

After the search commenced, but prior to the discovery of the drugs, the second trooper engaged in a recorded conversation with another trooper in which the second trooper described the initial stop on the highway as an "interdiction stop." He further stated that the occupants of the vehicle were "applicants for law enforcement," and "[t]hey're gonna receive law enforcement," commenting that "one's from Puerto Rico, the other one's from Mexico."

For the next 25 minutes, the first two troopers conducted a meticulous search of the van. At 9:15 a.m., one of the troopers removed from the large stereo speaker several balls of electrical tape. A trained drug detection dog alerted to the balls, which were later determined to contain heroin. Rodriguez and Munoz were arrested, and Rodriguez was charged with possession of a schedule I controlled substance.

The record is unclear as to exactly when the drug detection dog was requested by the first trooper. The Eagle County Sheriff's deputy who transported the dog testified that at 8:00 a.m. the state patrol dispatcher requested the assistance of the dog because the first trooper intended to search a vehicle. The deputy testified he arrived at the State Patrol headquarters in Eagle fifteen minutes after receipt of this call, and that when he arrived on the scene, at approximately 8:15 a.m., the troopers were already conducting their search. According to the testimony of the first trooper, he did not return to Eagle with Rodriguez and Munoz until 8:21 a.m. Thus, the request occurred sometime between 8:00 a.m. and 9:00 a.m. The district court did not resolve this discrepancy, but did find that the request for the drug detec-

tion dog could have been made as early as the roadside detention.

Rodriguez filed a motion to suppress the heroin. After conducting an evidentiary hearing, the district court denied the motion to suppress, ruling that the initial stop and the request for driver's license and registration were valid. The district court ruled that the discrepancies in the registration and license plate and the problems with the VIN created reasonable suspicion for the trooper to impound the van. The district court then concluded that Rodriguez voluntarily consented to the search of the van. The court commented that it was concerned that the troopers called for a drug detection dog as early as they did, but nevertheless, under the totality of the circumstances, ruled the search legal.

The court of appeals reversed the district court's denial of Rodriguez's motion to suppress. The court reasoned that the stop of the van was an appropriate investigatory stop based on the trooper's reasonable suspicion that Rodriguez was driving under the influence of alcohol. Once the trooper was satisfied that the driver was sober and decided not to ticket him for weaving, the court held that the trooper lacked reasonable suspicion to make further inquiries of Rodriguez. Subsequent information given by Rodriguez, such as his license and registration card, was the fruit of his illegal detention. The court applied the three part test articulated in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), to hold that the invalid stop tainted Rodriguez's consent to search and ruled that the heroin seized in the search must be suppressed.

At the request of the People we granted certiorari.[4] We affirm the court of appeals, but differ in our reasoning.

## II.

Our law concerning searches and seizures is extensively developed. With re-

---

4. The issues on certiorari were framed as follows:

 1. Whether a Colorado State Patrol Officer, who made a valid stop of a motorist for failure to stay in a single lane of traffic, had a valid basis to request the defendant's driver's license

and registration after the officer noted that the defendant was not intoxicated.

 2. Whether a valid detention of the suspect was conducted in order to determine if he was driving a stolen vehicle.

spect to the issues raised by this case we view the Colorado and United States Constitutions as co-extensive and therefore follow federal precedent as well as our own. Generally, warrantless searches and seizures are per se unreasonable unless they satisfy one of the specifically established and clearly articulated exceptions to the warrant requirement. One such exception is an arrest based upon probable cause. A second exception is a brief investigatory stop supported by a reasonable suspicion of criminal activity. *See Terry v. Ohio,* 392 U.S. 1, 30–31, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968). Because a limited seizure of a person is authorized by a standard of reasonable suspicion, which is less than the standard of probable cause, the investigatory stop must be "brief in duration, limited in scope, and narrow in purpose." *People v. Tottenhoff,* 691 P.2d 340, 343 (Colo.1984).

■ Stopping a motor vehicle implicates Fourth Amendment protections. An officer may engage in an investigatory stop of a car and then question the driver without running afoul of the Fourth Amendment's prohibition against unreasonable searches and seizures provided three conditions exist: (1) a reasonable suspicion that criminal activity has occurred, is taking place, or is about to take place; (2) a reasonable objective for the intrusion; and (3) a reasonable connection between the scope and character of the intrusion and its objective. *See People v. Altman,* 938 P.2d 142, 144 (Colo.1997); *People v. Davis,* 903 P.2d 1, 4 n. 6 (Colo.1995); *People v. Weston,* 869 P.2d 1293, 1296 (Colo.1994). In determining the validity of an investigatory stop, the district court must consider whether, under the totality of the circumstances, the "specific and articulable facts"

known to the officer at the time of the encounter and the rational inferences from these facts create a "reasonable suspicion of criminal activity to justify the intrusion into the defendant's personal security." *People v. Thomas,* 660 P.2d 1272, 1274 (Colo.1983); *see People v. H.J.,* 931 P.2d 1177, 1180 (Colo. 1997).

The People contend that the court of appeals erred in its determination that the trooper lacked reasonable suspicion to make further inquires once he was satisfied that Rodriguez was not intoxicated and he determined not to ticket Rodriguez for weaving. We agree.

The court of appeals applied the holding of *People v. Redinger,* 906 P.2d 81, 85 (Colo. 1995), to invalidate the trooper's request for information from Rodriguez because the purpose of the stop was accomplished when the trooper concluded that Rodriguez was sober and decided not to ticket him for weaving. Thus, the request for a driver's license and registration information was improper because it was not based on a reasonable suspicion that Rodriguez had committed or was committing a traffic offense. The court noted that if the request for information had been permitted after the trooper decided not to ticket Rodriguez for any traffic offense, this request would render meaningless the statutory requirement that a driver be required "to hand" an officer identifying information upon the officer's reasonable suspicion that the driver committed a traffic offense.[5]

■ Recent pronouncements of our court and the United States Supreme Court clarify that in reviewing an officer's conduct in making an investigatory stop, a reviewing court

---

3. Whether, at the conclusion of that detention, the suspect gave a voluntary consent to authorities for a search of his vehicle.

5. Section 42–2–113(1), 17 C.R.S. (1993), states: No person who has been issued a driver's ... license ... who operates a motor vehicle in this state, and who has such license ... in such person's immediate possession shall refuse to remove such license ... from any billfold, purse, cover, or other container and to hand

the same to any peace officer who has requested such person to do so if such peace officer reasonably suspects that such person is committing, has committed, or is about to commit a violation of article 2, 3, 4, 5, 6, 7, or 8 of this title.
*Cf.* § 42–2–115(1), 17 C.R.S. (1996 Supp.) (reenactment of above statute in substantially similar language).

must base its decision on an objective analysis of whether reasonable suspicion exists to justify the temporary intrusion and not upon the subjective intent of the arresting officer. *See Whren v. United States,* —— U.S. ——, ——, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996); *Altman,* 938 P.2d at 146. An officer's ulterior motives will not strip the officer of legal justification to conduct an investigatory stop.

As discussed by the Supreme Court in *Whren,* —— U.S. at ——, 116 S.Ct. at 1775, the objective test eliminates the evidentiary difficulty of establishing the subjective intent of the arresting officer. The objective test also serves as an acknowledgment that the Fourth Amendment's requirement of reasonableness "allows certain actions to be taken in certain circumstances, whatever the subjective intent." *Id.*

■ We do not mean to hold that trial courts must exclude, on relevancy grounds, all testimony regarding an officer's subjective beliefs at a hearing on a motion to suppress. *See People v. Sosbe,* 789 P.2d 1113, 1115 (Colo.1990). An officer's subjective assessment of the facts may be helpful to a district court's understanding of the facts confronting the officer at the time of the search. In addition, an officer's subjective intentions may affect his credibility. However, the critical holding of *Whren,* that an officer's illicit motives will not invalidate an otherwise valid search or seizure, requires disapproval of the decision of the court of appeals on this point.

■ Here, the trooper stopped Rodriguez suspecting him of two criminal offenses: weaving, which the trooper observed, and driving under the influence. Once the trooper determined that Rodriguez was sober he still possessed a reasonable suspicion that Rodriguez committed the traffic offense of weaving. His suspicion of weaving did not dissipate even though he decided not to issue Rodriguez a citation for weaving. The trooper's subjective decision not to ticket for weaving did not strip him of his authority to inquire further concerning the traffic offense of weaving. We hold that the trooper possessed an objectively reasonable and articulable suspicion that Rodriguez had engaged in criminal activity, namely, the traffic offense of weaving, and thus the trooper was authorized to request identifying information from Rodriguez.

■ The request for identification and information was reasonably related in scope and character to the investigation of the traffic offense. *See People v. Schreyer,* 640 P.2d 1147, 1150 (Colo.1982) ("Any temporary police detention made for the purpose of questioning a suspect who might otherwise escape is limited to determining an individual's identity or obtaining an explanation of his behavior."). Thus, we hold that the trooper's request for a driver's license and registration satisfies the conditions set forth in our case law for an investigatory detention and complies with the Fourth Amendment's requirement of reasonableness.

## III.

### A.

Next we address whether the trooper's detention of Rodriguez to investigate whether the van was stolen constituted a valid investigatory stop.

■ During a valid traffic stop an officer may request a driver's license, vehicle registration and proof of insurance. *See Redinger,* 906 P.2d at 85–86. An officer may also run a computer check for outstanding warrants so long as this procedure does not unreasonably extend the duration of the temporary detention. *See People v. Cobb,* 690 P.2d 848, 852 (Colo.1984). These intrusions are brief and minimal. *See H.J.,* 931 P.2d at 1182. Once a driver produces a valid license and proof that he is entitled to operate the vehicle, "he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning." *United States v. Mendez,* 118 F.3d 1426, 1429 (10th Cir.1997).

Rodriguez produced a valid license and a valid registration card. The trooper testified

that computer checks on the tendered information "came up clear." However, Rodriguez's hand-written registration card contained two irregularities. The license plate number was incorrect by one letter and the year of the van's manufacture did not match the information obtained from the computer check. In addition, no Nader Label existed on the doorjamb of the van. The People argue that these facts provided the trooper with reasonable suspicion to believe that the car might be stolen, and justified further detention of Rodriguez for additional investigation. We agree.

■■■ Insufficient proof of registration for a vehicle may provide reasonable suspicion to believe that the car may be stolen. *See H.J.*, 931 P.2d at 1181–82 (driver's failure to provide registration provided reasonable suspicion that car was stolen); *People v. Litchfield*, 918 P.2d 1099, 1103 (Colo.1996)[6] (during traffic stop of leased car, reasonable suspicion existed to detain occupants temporarily who provided two unsigned rental agreements, only one of which matched vehicle; passenger gave inconsistent statements as to the purpose of the trip; and vehicle was beyond geographical restrictions imposed by rental agreement). The facts of this case appear to be unusual because the vehicle registration was hand written and accompanied by an official document explaining that the registration card contained an error. We agree with the district court's assessment that "it's significant that there are two discrepancies rather than one." The two errors on the registration card coupled with the absence of a Nader Label furnished the trooper with reasonable suspicion that the van might be stolen. Hence, we hold that the trooper possessed a reasonable suspicion of criminal activity which authorized him to investigate further.[7]

### B.

Next we address whether the purpose of the detention was reasonable. The trooper's stated purpose was to detain the van to locate a hidden VIN.

A VIN serves three purposes. First, it simplifies and increases the accuracy of recall campaigns. *See* 49 C.F.R. § 565.1 (1996). Second, the VIN (as well as several other pieces of information) appears on a label which vehicle manufacturers are required to affix to most vehicles to assist consumers in determining which of the federal standards regarding safety and theft prevention apply to their vehicles. *See* 49 C.F.R. § 537.1 (1996); *see also* 49 U.S.C. § 30115 (1994). This label is commonly referred to as the "Nader Label." Third, the VIN aids in auto theft prevention. In 1985, the Department of Transportation promulgated the Federal Motor Vehicle Theft Prevention Standard, which requires manufacturers to affix the VIN permanently onto eighteen major automobile parts on most vehicles. *See* 49 C.F.R. § 541 (1996). The purpose of the Theft Prevention Standard is to "reduce the incidence of motor vehicle thefts by facilitating the tracing and recovery of parts from stolen vehicles." 49 C.F.R. § 541.2 (1996).

■■■ Because one of the express legislative purposes for affixing a VIN onto automobile parts is to assist law enforcement officers in recovering stolen vehicles, we hold that the trooper possessed a reasonable purpose in temporarily detaining Rodriguez and his van to compare the VIN obtained from the registration card and the dashboard with a hidden VIN located on the vehicle.[8]

### C.

■■■ Next we address whether the stop, given the scope and character of the

---

**6.** We note that a reasonable suspicion may support an investigatory stop and even a protective weapons search of a vehicle, but probable cause is required for actual impoundment of that vehicle. We limit our holding in *People v. Litchfield* accordingly.

**7.** We emphasize, the fact that a vehicle does not display a Nader Label is not determinative of the issue of reasonable suspicion because these la-

bels are not required on all vehicles. While the alteration or removal of a Nader Label may be an indication that the vehicle is stolen, the absence of a Nader Label is one factor among others to consider.

**8.** We recognize that the trooper in this case opened the door to the van and examined the doorjamb without Rodriguez's permission and that the two troopers also opened and looked

intrusion, was reasonably related to its purpose, the third prerequisite for an investigatory stop. This seizure of the person must be "brief in duration, limited in scope, and narrow in purpose." *Tottenhoff,* 691 P.2d at 343. When an investigatory stop involves more than a brief detention and questioning, the stop escalates into an arrest, which must be supported by probable cause. *See Schreyer,* 640 P.2d at 1150. Only when the officer possesses probable cause to arrest may he exceed the parameters of an investigatory stop. *See Davis,* 903 P.2d at 4; *Tottenhoff,* 691 P.2d at 344 (citing *People v. Reynolds,* 94 Ill.2d 160, 68 Ill.Dec. 122, 445 N.E.2d 766 (1983) (traffic stop ripened into an arrest when officer told defendant to drive and follow him to police station)).

■ To determine whether the parameters of an investigatory stop have been exceeded, we hold that the district court must consider at least four circumstances:

First, the length of the detention. The brevity of the intrusion "is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *United States v. Place,* 462 U.S. 696, 709, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983); *see Cobb,* 690 P.2d at 852 (officer may run a computer check for outstanding warrants during an investigatory stop provided that this procedure does not unreasonably extend the detention); *see generally* 4 Wayne R. LaFave, *Search and Seizure* § 9.2(f), at 58–65 (3d ed. 1996).

Second, whether the officer diligently pursued the investigation during the detention. *See United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985) ("[W]e consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain

the defendant."); *Place,* 462 U.S. at 709, 103 S.Ct. at 2645 (holding that an officer's diligent pursuit of an investigation *during* the detention is a factor in determining the reasonableness of an investigatory stop).

Third, whether the suspect was required to move from one location to another. *See Florida v. Royer,* 460 U.S. 491, 504, 103 S.Ct. 1319, 1328, 75 L.Ed.2d 229 (1983) (moving suspect from one location to another during an investigatory stop, in absence of safety and security reasons, exceeded scope of stop); *People v. Mickens,* 734 P.2d 646, 649 (Colo.App.1986); *see generally* 4 LaFave, *supra* § 9.2(g).

Fourth, whether there were alternative, less intrusive means available and "whether the police acted unreasonably in failing to recognize or to pursue [them]." *Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575; *see Royer,* 460 U.S. at 505, 103 S.Ct. at 1328.

Here, Rodriguez was detained for ninety minutes on a suspicion that the van was stolen. The reason given for this prolonged detention was that the trooper did not know the location of the hidden VIN. If the trooper could not, with reasonable brevity and minimal intrusiveness, locate another VIN on Rodriguez's vehicle for comparison with the registration and the VIN on the dashboard, he lacked constitutional authority to continue to detain Rodriguez. *Compare Sharpe,* 470 U.S. at 683, 105 S.Ct. at 1574 (twenty-minute detention was reasonable), *with Place,* 462 U.S. at 709–10, 103 S.Ct. at 2645–46 (ninety-minute detention of suspect's luggage was "prolonged" and exceeded scope of stop), *and People v. Hazelhurst,* 662 P.2d 1081, 1086 (Colo.1983) (twenty to thirty-minute detention exceeded scope of stop), *and Mickens,* 734 P.2d at 649 (one-and-one-half hour detention exceeded scope of stop).

The trooper did not diligently pursue the investigation during this ninety-minute de-

under the hood of the van. Because we resolve this case on other grounds, we do not reach the question of whether these intrusions violated the Fourth Amendment. *See, e.g., New York v. Class,* 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81

(1986) (holding that an officer did not violate the Fourth Amendment by moving papers on the dashboard covering the VIN); *see generally* 1 Wayne R. LaFave, *Search and Seizure* § 2.5(d), at 561 (3d ed.1996).

tention. Rather than search for the hidden VIN at the Wolcott exit out of harm's way of the interstate, the trooper chose to force the occupants of the van to travel ten miles in the opposite direction of their destination. The forced return to Eagle was not calculated to dispel quickly the suspicion that the van was stolen; nor did it constitute a brief and minimal intrusion for Rodriguez. The return to Eagle for further investigation is not consistent with a diligent investigation. In Eagle, the trooper discovered the matching VIN under the hood at 8:36 a.m., which dispelled his suspicions that the van was stolen. He continued to detain Rodriguez and his family for an additional fifteen minutes for no apparent reason before returning Rodriguez's documents and informing Rodriguez that he was free to leave. This fifteen-minute delay also is not indicative of a diligent investigation.

The trooper testified that he required the van to return to Eagle because of safety concerns had he searched for the hidden VIN on the shoulder of I-70. The district court agreed, stating the interstate presents "risks" and that "[i]t's certainly arguable that it's nicer to do things that are going to take a little bit of time in town where there's a restaurant right across the street, whether you use it or not, rather than out on an interstate highway." However, an investigatory traffic stop does not permit a prolonged detention intrusive to the point where the occupants of a vehicle are forced to wait in a restaurant. The trooper detained Rodriguez near the Wolcott exit of I-70. Assuming safety was an issue, and we feel compelled to note that the trooper detained Rodriguez for over forty minutes on the interstate highway before coming to this conclusion, then the appropriate measure was to move off of the interstate at the Wolcott exit to conduct further investigation.

We conclude investigation at the Wolcott exit was an available alternative to the forced drive back to Eagle. The trooper unreasonably failed to recognize or pursue this alternative. In reaching this conclusion we are mindful of the Supreme Court's warning to reviewing courts not to engage in creative post hoc evaluations of police misconduct, but to determine only whether the police acted unreasonably in a given case. *See Sharpe*, 470 U.S. at 686, 105 S.Ct. at 1575.

In summary, we hold that the trooper's detention of Rodriguez, which started as a traffic stop near the Wolcott exit on I-70 and ended ninety minutes later and ten miles away in Eagle, was an investigatory stop which exceeded the reasonableness requirement of the Fourth Amendment to the United States Constitution.

We hold that the traffic stop in this case escalated into an arrest when the trooper forced Rodriguez to drive to the state patrol office in Eagle. The two discrepancies regarding the registration and the absence of a Nader Label on the doorjamb of the van, when combined with the computer verification that Rodriguez owned the vehicle and that it had not been reported stolen, did not provide the trooper with probable cause to believe that the van was stolen. Hence, Rodriguez's arrest violated his right to be free of unreasonable searches and seizures. His arrest was illegal.

## IV.

Next we address whether the heroin discovered in the van should have been suppressed as the fruit of this illegal arrest as the court of appeals held, or whether, as argued by the People, Rodriguez's consent to the search sufficiently attenuated the taint of this illegal arrest. We affirm the analysis of the court of appeals.

Evidence obtained as a direct result of an illegal search or seizure is inadmissible. *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963) (articulation of "fruit of the poisonous tree doctrine"). To determine whether evidence was obtained as a direct result of police illegality, the relevant inquiry is whether the evidence was "come at by exploitation of that illegality or instead by means

sufficiently distinguishable to be purged of the primary taint." *Id.* at 488, 83 S.Ct. at 417. If the connection between the evidence and the illegality is "so attenuated as to dissipate the taint, the evidence will not be suppressed." *Id.* at 487, 83 S.Ct. at 417 (a defendant's illegal arrest did not taint statement when the defendant voluntarily came to the police station several days after the arraignment); *cf. People v. Lowe*, 200 Colo. 470, 476, 616 P.2d 118, 123 (1980) (prosecution failed to prove that tape-recorded statement taken within thirty-five minutes of illegally obtained statement was free of the taint of the initial illegal questioning).

 When illegal police action precedes a defendant's consent to search, the defendant's later consent may dissipate the taint of the police illegality. On the other hand, the police illegality may fatally taint the consent. *See Royer*, 460 U.S. at 507–08, 103 S.Ct. at 1329–30 (later consent tainted by illegal seizure of Royer undertaken as part of the officer's attempt to gain his consent to search Royer's luggage). In deciding whether a defendant's consent was "sufficiently an act of free will to purge the primary taint of the unlawful invasion," *Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416–17, no single factor is dispositive. *See Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62. A reviewing court must consider the "temporal proximity of the arrest and the [consent], the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Id.* (citations omitted); *see People v. Breidenbach*, 875 P.2d 879, 890 (Colo.1994) (applying the *Brown* test and holding that consent given after an interrogation in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was tainted by this illegality); *see generally* 3 LaFave, *supra* § 8.2(d), at 659–62 (3d ed.1996).

 We hold that evidence obtained by a purported consent that follows improper conduct by police must meet a two-fold test: (1) was the consent obtained through exploitation of the prior illegality; and (2) was the consent voluntary? Evidence obtained by a purported consent is admissible "only if it is determined that the consent was *both* voluntary and not an exploitation of the prior illegality." *United States v. Melendez–Garcia*, 28 F.3d 1046, 1055 (10th Cir.1994) (emphasis added) (citing 3 LaFave, *supra* § 8.2(d)); *see People v. Traubert*, 199 Colo. 322, 608 P.2d 342, 346–47 (1980); *Arcila v. State*, 834 S.W.2d 357, 358 (Tex.Crim.App. 1992); *see also Brown*, 422 U.S. at 604, 95 S.Ct. at 2262 (a confession must be both voluntary and attenuated from prior police illegality). Even if a defendant's consent is voluntary, then the evidence will not be admissible unless the consent represents "an act of free will [sufficient] to purge the primary taint" of police illegality. *Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416. Conversely, the fact that the consent and the illegality are attenuated does not preclude the possibility that the evidence will be inadmissible on the grounds that the consent was not voluntary. The prosecution bears the burden of proving both attenuation and voluntariness when seeking admission of evidence discovered during a consent search. *See Brown*, 422 U.S. at 604, 95 S.Ct. at 2262; *Traubert*, 199 Colo. at 329, 608 P.2d at 347.

 Here, the proximity of the arrest and the consent was immediate. With the same breath the trooper told Rodriguez he was free to go and requested consent to search:

> You're free to go now. Would it be all right if we searched your van?

No intervening circumstances occurred between the illegal arrest and the consent. *Cf. People v. Padgett*, 932 P.2d 810, 816–17 (Colo.1997).

Focusing on police misconduct, we are guided by the statements of the United States Supreme Court concerning "the purpose and flagrancy of official misconduct."

The illegality here, moreover, had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowl-

edged, in their testimony, that the purpose of their action was "for investigation" or for "questioning." The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which Brown's arrest was affected gives the appearance of having been calculated to cause surprise, fright, and confusion.

*Brown*, 422 U.S. at 605, 95 S.Ct. at 2262. Rodriguez's "consent" was obtained in a manner calculated to cause surprise, fright, and confusion. While Rodriguez was still in custody, the troopers, aware that Rodriguez spoke little English, intentionally separated Rodriguez from his interpreter, Munoz, by taking him to the back of the van, where three troopers, armed and uniformed, surrounded him. The troopers told Rodriguez that he was free to go but at the same time asked if he "would mind" if they searched his van. Other facts call into question the purpose of this prolonged detention: the troopers requested a drug detection dog, perhaps as early as the roadside detention, but clearly well before the request for the "consent to search" was given; one trooper characterized the detention of Rodriguez, his family, his van and Munoz as an "interdiction stop"; the trooper further stated that Rodriguez and Munoz were "applicants for law enforcement" and "they're gonna receive law enforcement," commenting that "one's from Puerto Rico, the other one's from Mexico." The district court aptly observed: "You sure have a question as to whether this vehicle number is really what the officers are worrying about."

Rodriguez, his family and Munoz were detained for ninety minutes and forced to drive to Eagle so that the troopers could ascertain whether any drugs would turn up. The design and execution of this arrest was investigatory, resembling police conduct condemned by the Supreme Court in *Florida v. Royer*, where the seizure of Royer was undertaken as part of the officer's attempt to gain his consent to a search of his luggage.

We hold that Rodriguez's consent was not sufficiently attenuated from his illegal arrest, but instead was tainted by the police illegality and therefore is ineffective. Because of our holding, we do not reach the question of whether Rodriguez's consent was voluntary.

## V.

We hold that when an officer possesses reasonable suspicion that a traffic offense has been committed and the officer has decided not to give the driver a ticket for the traffic offense, the officer may request identifying information from the driver, such as a driver's license, vehicle registration and proof of insurance. We hold this request for information is constitutionally permissible because the officer's conduct is to be evaluated on the basis of an objective standard. The officer's subjective decision not to give a ticket does not strip the officer of legal justification to make further inquiries. The circumstances of this case, that is, minor discrepancies in the van registration and the lack of the Nader safety label on the doorjamb of the van, furnished reasonable suspicion for the trooper to investigate further whether the van was stolen. However, the ninety-minute detention of Rodriguez and the ten-mile forced drive in this case exceeded the permissible parameters of an investigatory stop. The temporary detention escalated into an arrest unsupported by probable cause to believe that the van was stolen, in violation of the Fourth Amendment to the United States Constitution and Article II, Section 8 of the Colorado Constitution. Rodriguez's arrest was illegal. His consent to search was not sufficiently attenuated from this illegal arrest which immediately preceded his consent. Hence, we conclude that the heroin discovered in the search of Rodriguez's van must be suppressed. We affirm and remand to the court of appeals to return this case to the district court for further proceedings consistent with this opinion.

VOLLACK, C.J., concurs in part and dissents in part, and MULLARKEY, J., joins in the concurrence and dissent.

Chief Justice VOLLACK concurring in part and dissenting in part:

The majority holds in part II of its opinion that when an officer possesses reasonable

suspicion that a traffic offense has been committed and the officer has decided not to give the driver a ticket for the traffic offense, the officer may nevertheless request identifying information from the driver. I concur with this part of the majority's opinion.

In part III of its opinion, the majority holds that in the current case: (a) the trooper possessed a reasonable suspicion that the van which Rodriguez drove was stolen; and (b) the trooper possessed a reasonable purpose in temporarily detaining Rodriguez to compare the VIN on the van's registration card and the dashboard with a hidden VIN located on the van. I concur with this part of the majority's opinion. However, the majority further holds that the scope of the investigatory stop in this case was not reasonably related to its purpose. I dissent to this part of the majority's opinion because I believe that under the circumstances of this case, the scope of the investigatory stop was reasonably related to its purpose of establishing whether the van was stolen.

The majority further holds in part IV of its opinion that Rodriguez' consent to search his van did not sufficiently attenuate the search from the trooper's illegal investigatory stop; the majority thus affirms the suppression of the evidence. I dissent to this part of the majority's opinion. In my view, Rodriguez' consent to search his van sufficiently attenuated the search from any prior illegality so as to dissipate the taint of such illegality. Consequently, I believe the court of appeals erroneously ruled that the evidence obtained as a result of the search should have been suppressed.

Accordingly, I concur in part and dissent in part.

## I.

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court held that law enforcement personnel may, in compliance with the Fourth Amendment, conduct brief investigatory stops based on reasonable suspicion.

*Id.* at 30–31, 88 S.Ct. at 1884–85. To justify an investigatory stop, three conditions must exist: (1) the officer must have a reasonable suspicion that criminal activity has occurred, is occurring, or is about to occur; (2) the purpose of the detention must be reasonable; and (3) the scope and character of the detention must be reasonable when considered in light of its purpose. *See People v. Sutherland,* 886 P.2d 681, 686 (Colo.1994).

This court has held that conditions which justify subjecting a person to an investigatory stop must be judged against an objective standard that takes into consideration the facts and circumstances known to the officer at the time of the intrusion and evaluates the purpose, scope, and character of the intrusion in light of those facts. *See People v. Savage,* 698 P.2d 1330, 1334–35 (Colo.1985). Because a limited seizure of the person is authorized on a standard less than that of probable cause, it must be brief in duration, limited in scope, and narrow in purpose. *See People v. Tottenhoff,* 691 P.2d 340, 343 (Colo. 1984).

Despite Colorado's established standard for determining whether the scope of an investigatory stop is reasonably related to its purpose, the majority sets forth a new test for making such a determination. Specifically, the majority holds that four factors must be considered in determining whether the parameters of an investigatory stop have been exceeded: (1) the length of the detention; (2) whether the officer diligently pursued the investigation during the detention; (3) whether the suspect was required to move from one location to another; and (4) whether there were alternative, less intrusive means available and whether the police acted unreasonably in failing to recognize or pursue such means. *See* maj. op. at ——–——.

In my view, this court should not adopt this test if it becomes a litmus-paper test for determining whether the scope of an investigatory stop is proper. As the United States Supreme Court has stated, there is no "litmus-paper test for ... determining when a seizure exceeds the bounds of an investiga-

tive stop." *Florida v. Royer*, 460 U.S. 491, 506, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983). Although the majority cites several Supreme Court cases in support of its four factors for determining the proper scope of an investigatory stop, these cases do not adopt a similar four-factor test and their holdings are specific to their facts.

### A.

The majority cites *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), for its holding that the detention in the current case was prolonged and thus exceeded the proper scope of an investigatory stop. In *Place,* law enforcement officers stopped the defendant at an airport and obtained his identification and airplane ticket receipt. After the defendant refused to consent to a search of his luggage, the officers seized the defendant's luggage for approximately ninety minutes to conduct a "canine sniff" by a narcotics detection dog. The Supreme Court stated that "although we decline to adopt any outside time limitation for a permissible [investigatory] stop, we ... cannot [approve the length of the detention] *on the facts presented by this case." Id.* at 709–710, 103 S.Ct. at 2646 (emphasis added). Thus, the holding in *Place* is fact-specific and does not set forth a time limitation for a proper investigatory stop.

The current case is distinguishable from *Place* in several ways. First, although the entire investigatory stop here lasted for approximately eighty-five minutes,[1] the initial forty-two minutes of this detention involved obtaining Rodriguez' driver's license, vehicle registration, and VIN. The trooper then discovered a discrepancy in the VIN and was unable to determine whether the van was stolen. As the majority acknowledges, the trooper's actions during these initial forty-two minutes were reasonably related to the purpose of the investigatory stop.

As to the latter forty-three minutes of the investigatory stop, the trooper's actions dur-

ing that time were also reasonable. Specifically, the trooper could not determine whether the van was stolen because he did not know the location of the hidden VIN. The trooper consequently determined that the best means of determining whether the van was stolen was by contacting a state patrol auto theft specialist who could tell him where the hidden VIN could be found. The trooper also decided that the state patrol headquarters would be a better location to conduct any further investigation and thus requested that Rodriguez follow him to the headquarters. The latter forty-three minutes of the detention was reasonably related to the purpose of the investigatory stop because it involved a reasonable means for determining whether the van was stolen. As such, I believe that the length of the investigatory stop in this case was reasonable.

### B.

Additionally, the majority cites *Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110, for its holding that the trooper did not diligently pursue the investigation in the current case. In *Place*, the defendant had aroused the suspicion of law enforcement officers at Miami International Airport. Because the Miami officers did not have time to detain the defendant before his flight departed to New York, they contacted officers in New York to relay their suspicions about the defendant. The officers in New York subsequently detained the defendant at New York's La Guardia Airport. The Supreme Court held that the New York officers in that case did not diligently pursue their investigation of the defendant because the officers "knew the time of [the defendant's] scheduled arrival at La Guardia [Airport], had ample time to arrange for their additional investigation at that location, and thereby could have minimized the intrusion on [the defendant's] Fourth Amendment interests." *Id.* at 709, 103 S.Ct. at 2645. Thus, the Supreme Court's holding in *Place* regarding the offi-

---

1. Rodriguez was stopped at approximately 7:25 a.m. and was told that he was free to leave at approximately 8:50 a.m.

cers' lack of diligence was specific to the facts of that case.

In the current case, the majority holds that "[t]he return to Eagle for further investigation is not consistent with a diligent investigation." Maj. op. at 1363. To the contrary, I believe that the return to Eagle was part of a diligent investigation because it allowed the trooper to efficiently contact a state patrol auto theft specialist who could tell him where the hidden VIN could be found. This made it possible for the trooper to efficiently determine whether Rodriguez' van was stolen and thus constituted a diligent investigation.

### C.

Moreover, the majority cites *Royer,* 460 U.S. 491, 103 S.Ct. 1319, for its holding that in the absence of safety concerns, moving a suspect from one location to another during an investigatory stop exceeds the reasonable scope of the· stop. However, in *Royer,* the Supreme Court simply held that "the record [did] not reflect·any facts which would support a finding that·the legitimate law enforcement purposes which justified the detention in the first instance were furthered by removing" the defendant to a different location. *Id.* at 505, 103 S.Ct. at 1328. Thus, the *Royer* holding is specific to the facts of that case and does not provide a definitive rule on the effect of moving a suspect during an investigatory stop.

In the current case, the majority, holds that the trooper exceeded the proper scope of an investigatory stop by moving Rodriguez from the side of the highway to the state patrol headquarters in Eagle. However, I believe that such a move was properly within the scope of the investigatory stop in light of the trooper's decision that the state patrol headquarters would be a better location to conduct further investigations, such as contacting a state patrol auto theft specialist who could tell the trooper where the hidden VIN could be found. Furthermore, the majority's rejection of moving a suspect during an investigatory stop conflicts with this

court's holding in *People v. Stevens,* 183 Colo. 399, 407, 517 P.2d 1336, 1340 (1973). In *Stevens,* this court held that moving a suspect from one location to another during an investigatory stop was proper, regardless of safety concerns. *See also Place,* 462 U.S. at 705–06, 103 S.Ct. at 2643–44 (holding that during investigatory stop, police may transport seized property to another location).

### D.

Finally, the majority cites *Sharpe* for its holding that in the current case, there were alternative, less intrusive means available to the trooper which he unreasonably failed to recognize and pursue. However, in *Sharpe,* the United States Supreme Court expressly warned that reviewing courts should not engage in creative post hoc evaluations of police conduct, but should simply determine whether the police acted reasonably in a given case. *See Sharpe,* 470 U.S. at 686–87, 105 S.Ct. at 1575–76 (1985). Here, although the trooper could have conducted the remainder of the investigatory stop at the Wolcott exit instead of at the state patrol headquarters in Eagle, the Supreme Court's admonition in *Sharpe* precludes this court from imposing a post hoc requirement that the trooper pursue such an alternative. Rather, the inquiry is whether the trooper acted reasonably in conducting the remainder of the investigatory stop at the state patrol headquarters. As discussed above, I believe that the trooper acted reasonably in his investigation by moving the van to the headquarters.

In summary, the majority holds that the trooper possessed a reasonable suspicion that the van was stolen and a reasonable purpose in temporarily detaining Rodriguez. This holding is based on the fact that Rodriguez' vehicle registration was handwritten and contained two discrepancies, along with the fact that a Nader Label was not found on the van's door jamb. Nevertheless, the majority determines that the scope of the investigatory stop was not reasonably related to its purpose. I disagree because I believe that under the circumstances of this case, the

scope of the investigatory stop was reasonably related to its purpose of establishing whether the van was stolen.

## II.

Additionally, I disagree with the majority's conclusion that Rodriguez' consent to search his van did not sufficiently attenuate the prior investigatory stop from the search. Although I maintain that the investigatory stop in this case was proper, I believe that even if the stop was improper, Rodriguez' consent to search his van sufficiently attenuated the investigatory stop from the search.

If evidence is obtained as a result of a consent to search, such evidence is admissible if the consent is determined to be (a) not an exploitation of the prior illegality; and (b) voluntary. *See People v. Traubert,* 199 Colo. 322, 329, 608 P.2d 342, 347 (1980). The first prong has been recognized as the attenuation doctrine, which is an exception to the exclusionary rule and justifies admission of evidence even though the evidence is derived from information obtained in violation of the Fourth Amendment. *See People v. Burola,* 848 P.2d 958, 961 (Colo.1993). Under the attenuation doctrine:

> if the prosecution can show that any connection between official illegality and the prosecution's evidence has "become so attenuated as to dissipate the taint," the evidence will be admissible.

*People v. Jones,* 828 P.2d 797, 800 (Colo.1992) (quoting *Wong Sun v. United States,* 371 U.S. 471, 491, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963)). Whether the taint of the constitutional violation has dissipated is determined by examining the intervening events between the violation and the evidence sought to be introduced. *See People v. T.C.,* 898 P.2d 20, 27 (Colo.1995). If the intervening events have dispelled the causal link so that the offered evidence is significantly free from contamination, then the taint of the constitutional violation has been removed. *See id.*

As to the second prong for admitting evidence obtained as a result of a consent to search, the consent is voluntary if it is the product of free choice and not the result of duress, coercion, threats, or promises that are calculated to flaw the free and unconstrained nature of the decision. *See Savage,* 698 P.2d at 1334. Whether consent to search is voluntary is a question of fact to be determined from the totality of the circumstances. *See People v. Carlson,* 677 P.2d 310, 318 (Colo.1984). Where the record presents conflicting evidence, the trial court's factual findings are entitled to deference unless the findings are so erroneous as to find no support in the record. *See Salazar v. People,* 870 P.2d 1215, 1221 (Colo.1994).

In the current case, the trooper indicated to Rodriguez that the investigatory stop was completed by returning Rodriguez' driver's license and vehicle registration and telling him that he was free to leave. The trooper then asked Rodriguez if he could search Rodriguez' van, and Rodriguez consented. When Rodriguez gave his consent to search the van after being told that he was free to leave, he created an intervening event which sufficiently dispelled the link between the investigatory stop and the search. Under these facts, the evidence obtained as a result of the search was significantly free from contamination and the taint of the investigatory stop had been removed.

Moreover, the totality of the circumstances indicate that Rodriguez' consent was given voluntarily. At the suppression hearing, the trial court heard testimony from both Rodriguez and the trooper as to Rodriguez' ability to speak and understand English. Rodriguez testified that due to his limited ability to speak and understand English, he did not understand the trooper's statement that Rodriguez was free to leave or the trooper's request to search his van. In contrast, the trooper testified that Rodriguez appeared to understand the trooper's request to search his van. Additionally, a videotape of the trooper's request to search Rodriguez' van and Rodriguez' response was introduced into evidence. Based on this evidence, the trial court found that Rodriguez understood the trooper's request to search his van. Because the trial court's factual finding is supported

by the record, this court should defer to the trial court's finding on the issue of Rodriguez' ability to understand the trooper's request.

Given that Rodriguez understood the trooper's request to search his van, the facts indicate that Rodriguez voluntarily gave his consent for the search. Here, the trooper asked Rodriguez if he could search Rodriguez' van, and Rodriguez responded, "Sure." The trooper then reiterated his request by asking, "Is it okay?" and Rodriguez again responded, "It's okay." Rodriguez then obtained his keys to the van and opened the back door of the van without the trooper asking him to do so. There is no evidence that the trooper used duress, threats, or promises to obtain Rodriguez' consent to search his van. The facts of this case thus indicate that Rodriguez' consent was the product of free choice and the record supports the trial court's finding that Rodriguez' consent was voluntary.

Accordingly, I believe that Rodriguez' consent to search his van was voluntary and sufficiently attenuated the stop from the search so as to remove the taint of any prior illegality. The evidence obtained as a result of Rodriguez' consent to search therefore should be admitted.

For the foregoing reasons, I concur in part and dissent in part. I am authorized to say that Justice MULLARKEY joins in this concurrence and dissent.