Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
December 23, 2019

**2019 CO 108**

**No. 17SC123, *Williams v. People*—Searches and Seizures—Persons Giving Consent—Objecting Joint Occupants.**

Consent by one resident of jointly occupied premises generally suffices to justify a warrantless search. But *Georgia v. Randolph*, 547 U.S. 103 (2006), carved out a narrow exception to this rule: Consent by one resident is insufficient when another resident is physically present and objects to the search.

This case requires the supreme court to decide whether the *Randolph* exception applies where the defendant's wife provided police officers consent to enter the residence, and the defendant, though physically present, did not object until after the officers had already entered and were in the process of collecting drugs and paraphernalia. The court concludes that the *Randolph* exception does not apply. The *Randolph* exception applies only if, at the time the officers receive an occupant's consent, a co-occupant who is physically present on the premises

objects.   Accordingly, the officers were not required to heed the defendant's request to leave and did not violate his Fourth Amendment rights.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2019 CO 108

### Supreme Court Case No. 17SC123
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 14CA1547

### Petitioner:

Kirk Thomas Williams,

v.

### Respondent:

The People of the State of Colorado.

### Judgment Affirmed
*en banc*
December 23, 2019

**Attorneys for Petitioner:**
Megan A. Ring, Public Defender
Andrea R. Gammell, Deputy Public Defender
    *Denver, Colorado*

**Attorneys for Respondent:**
Philip J. Weiser, Attorney General
Rebecca A. Adams, Senior Assistant Attorney General
    *Denver, Colorado*

**JUSTICE SAMOUR** delivered the Opinion of the Court.

¶1    It is axiomatic that consent by someone who possesses common authority over jointly occupied premises generally suffices to justify a warrantless search.[1] But in *Georgia v. Randolph*, 547 U.S. 103 (2006), the Supreme Court carved out a narrow exception to this rule: Consent by one resident is insufficient when another resident is physically present and objects to the search.[2] *Id.* at 122–23. The Court in *Randolph* drew a fine line for the sake of clarity, practicality, and administrability: If a resident is present at the threshold of the premises and objects as officers propose to conduct a search, a co-occupant's consent does not suffice; however, if the objecting resident does not take part in the threshold colloquy between the officers and his co-occupant, he "loses out." *Id.* at 121. Adhering to this deliberately formalistic rule, in *Fernandez v. California*, 571 U.S. 292 (2014), the Court declined to apply the *Randolph* exception where the defendant was initially present and objected to the police entering his apartment but neither was present nor objected approximately an hour later when his co-occupant consented to a search. *Id.* at 294–96.

---

[1] By "common authority," we mean mutual use of the property by individuals who generally have joint access or control for most purposes. *See United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974).

[2] Throughout this opinion, we use "resident," "occupant," and "tenant" interchangeably to refer to individuals with common authority over premises.

¶2    This case is the flip side of the *Fernandez* coin.  Whereas *Fernandez* dealt with a defendant who objected *before* his co-occupant and officers engaged in the colloquy regarding consent, we deal here with a defendant who did not object until *after* his co-occupant had already provided officers consent and they were inside his residence.

¶3    We reach the same result the Court did in *Fernandez* and conclude that the *Randolph* exception does not apply and that the police officers who entered Kirk Thomas Williams's home did not violate his rights under the Fourth Amendment. Leonora Williams, Mr. Williams's wife, provided the officers consent and permitted them to enter so that they could take possession of drugs and drug paraphernalia she had found in his travel bag and concealed in the garage. Although Mr. Williams was physically present on the premises, he did not object as his wife allowed the officers inside.  His subsequent objection, after the officers had already entered his home and were in the process of taking possession of the drugs and paraphernalia, could not vitiate her previously given consent. Therefore, the officers were not required to heed his request to leave.

¶4    The court of appeals correctly upheld the district court's ruling denying Mr. Williams's motion to suppress the evidence collected inside his home.  But it did so for different reasons than those we articulate in this opinion.  Therefore, we affirm its judgment on other grounds.

# I

¶5     After Mr. Williams returned home from a trip to North Dakota, his wife went through his overnight travel bag and discovered what she believed to be drugs and paraphernalia. She took the contraband items, placed them inside a soap dish, and hid the soap dish in the garage of their home. Mrs. Williams later called the Fort Collins Police Department and met with one of its officers, Officer Thomas Colvin, at her church. She told him that she wanted the police to collect the drugs and paraphernalia she had taken from her husband's travel bag and stored in the garage. Officer Colvin requested assistance, and Officers Jesse Reed and Stephan Sparacio responded. The three officers then accompanied Mrs. Williams home.

¶6     Upon arriving home, Mrs. Williams provided consent and allowed the officers to enter so they could take possession of the drugs and paraphernalia. At Mrs. Williams's request, Officer Reed followed her through the house to the garage. There, Mrs. Williams retrieved the soap dish she had stashed away and handed it to him. Meanwhile, Officer Colvin continued walking down the entrance hallway for about ten feet, at which point he saw the kitchen, the living room, and an open space dividing the two. He headed toward the living room because he saw Mr. Williams there, sitting on a couch, eating a bowl of cereal, and watching television.

¶7    Officer Colvin viewed his job as keeping the peace between Mr. and Mrs. Williams.  Similarly, Officer Sparacio focused on making sure the situation remained calm and safe.  The officers were concerned because Mr. and Mrs. Williams were both home and there seemed to be some conflict between them.

¶8    When Officer Colvin entered the living room, he advised Mr. Williams that officers were conducting a "civil standby" and told him to remain seated.[3]  At some point, Mr. Williams told the officers to leave his home.

¶9    Shortly after Officers Colvin and Sparacio contacted Mr. Williams, Mrs. Williams and Officer Reed returned from the garage.  Officer Reed handed Officer Colvin the soap dish Mrs. Williams had retrieved.  Upon opening it, Officer Colvin discovered it contained methamphetamine and a glass pipe.  The officers arrested Mr. Williams, removed him from the residence, and placed him in a patrol car.  Officer Colvin estimated that "within five minutes, things were pretty much done."

¶10   Following a pretrial suppression hearing, the district court issued a written order denying Mr. Williams's request to exclude the methamphetamine and the

---

[3] It is undisputed that the officers were not conducting a civil standby.  But Officer Colvin apparently felt that it would be quicker, easier, and wiser if he avoided getting into the real reason for their presence in the home.

pipe from the trial. A jury subsequently found Mr. Williams guilty of possession of more than two grams of methamphetamine, a level 4 drug felony. The district court then sentenced Mr. Williams to one year in community corrections. Mr. Williams appealed, and a division of the court of appeals affirmed.

¶11 As relevant here, a majority of the division agreed with the district court's determination that the search that yielded the methamphetamine and the pipe was not a search within the meaning of the Fourth Amendment because Mrs. Williams had a legitimate interest in removing the contraband from her home, acted on her own initiative and not as an agent of the state, and the officers' actions did not exceed the scope of her private search. *People v. Williams*, No. 14CA1547, ¶¶ 15–16 (Jan. 5, 2017). The division majority felt it was unclear whether the exception in *Randolph* applied because Mr. Williams asked the officers to leave *after* they were already inside the house pursuant to his wife's consent. *Id.* at ¶ 17. But since it concluded that the officers entered the residence with Mrs. Williams's consent, did not conduct a search inside the house, and the methamphetamine and the pipe were fruits of Mrs. Williams's private search and not subject to the exclusionary rule, it reasoned that it did not have to resolve the *Randolph* question. *Id.* at ¶¶ 17–18. Writing separately, Judge Berger expressed concern about the soundness of the majority's analysis but nevertheless concurred in the judgment. *Id.* at ¶ 25 (Berger, J., specially concurring).

6

¶12 Mr. Williams then filed a petition for certiorari review, and we granted the petition in part.[4]

## II

¶13 Before us, Mr. Williams advances three contentions: (1) the division erred in holding that no search implicating the Fourth Amendment occurred; (2) under *Randolph*, his objection was dispositive as to him, regardless of his wife's consent, and therefore the officers were not authorized to remain in his residence when he asked them to leave; and (3) the inevitable discovery exception to the exclusionary

---

[4] We granted certiorari to review three issues:

1. Whether the court of appeals erred in holding that no search implicating the Fourth Amendment occurred when police officers entered the defendant's home, accompanied the defendant's wife to retrieve contraband belonging to the defendant that his wife had hidden, and seized the contraband.

2. Whether, under *Georgia v. Randolph*, 547 U.S. 103 (2006), a police officer may remain in a residence absent a warrant or an exigency when one occupant consents but another occupant is physically present and objects.

3. Whether the inevitable discovery doctrine applies when police officers are not already pursuing alternative lawful means of discovery at the time of an unlawful search and seizure.

7

rule does not apply.[5] We decline to address the first assertion because we conclude that, even if a search implicating the Fourth Amendment occurred, under *Randolph* and *Fernandez*, the officers were justified in remaining in the Williams residence after Mr. Williams asked them to leave. And, because we find that the officers did not violate the Fourth Amendment, we need not resolve Mr. Williams's inevitable-discovery assertion either. Hence, we limit our discussion to the applicability of the *Randolph* exception.

## A

¶14    Our review of a district court's suppression order presents "a mixed question of law and fact." *People v. Allen*, 2019 CO 88, ¶ 13, 450 P.3d 724, 728 (quoting *People v. Threlkel*, 2019 CO 18, ¶ 15, 438 P.3d 722, 727). We defer to the district court's findings of fact "and do not disturb them if they are supported by competent evidence in the record." *Id.* But we review de novo the district court's legal conclusions. *Id.* Whether the *Randolph* exception applies here is a legal question we review de novo.

---

[5] In his concurrence, Judge Berger opined that the inevitable discovery doctrine supported the district court's ruling. *Williams*, ¶¶ 35–38 (Berger, J., specially concurring).

## B

¶15 The Fourth Amendment prohibits unreasonable searches and seizures. *Id.* at ¶ 15, 450 P.3d at 728. "[T]he text of the Fourth Amendment does not specify when a search warrant must be obtained." *Kentucky v. King*, 563 U.S. 452, 459 (2011). But there is a presumption that when police officers conduct a search of a home without first securing a warrant, the search is unreasonable and thus unconstitutional. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Nevertheless, because the touchstone of the Fourth Amendment is reasonableness, the Supreme Court has long recognized certain exceptions to the warrant requirement. *Id.*

¶16 One such exception is a consent search. This exception makes sense, as it would be "absurd" to require the police to obtain a search warrant "when the sole owner or occupant of a house or apartment voluntarily consents to a search." *Fernandez*, 571 U.S. at 298. It is beyond dispute that such an owner or occupant has a right to allow others to enter and examine her residence, "and there is no reason why [she] should not be permitted to extend this same privilege to police officers if that is [her] choice." *Id.*

¶17 But the situation gets trickier when two or more occupants share common authority over a jointly occupied residence. Do they all have to consent to a search? Or is one occupant's consent sufficient? And what if one occupant consents, but the other contemporaneously objects?

¶18 Almost a half century ago, in *United States v. Matlock*, 415 U.S. 164 (1974), the Supreme Court determined that consent to search provided by an occupant who possesses common authority over the premises is sufficient and such consent is valid against the absent, nonconsenting occupant with whom she shares that authority. *Id.* at 171. There, after Matlock was indicted for bank robbery, police officers arrested him in the front yard of a home he shared with a woman named Graff and her family. *Id.* at 166. Matlock was then placed in a patrol car. *Id.* Rather than ask Matlock for consent to search the room he shared with Graff, police officers knocked on the front door of the residence and asked Graff for consent to search the house, which she provided. *Id.* In the room she and Matlock shared, officers found incriminating evidence. *Id.* at 166–67. The trial court later granted Matlock's pretrial request to suppress the evidence recovered, and the United States Court of Appeals for the Seventh Circuit affirmed. *Id.* at 167–69.

¶19 But the Supreme Court reversed. It held that a warrantless search is generally valid if it is based on the consent of a third party with common authority over the premises. *Id.* at 170–71. Therefore, concluded the Court, Graff's consent was sufficient to justify the warrantless search. *Id.* at 177. In assessing the reasonableness of the search, the Court looked to the "commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests." *Randolph*, 547 U.S. at 111 (discussing *Matlock*). It

likened this understanding of shared tenancy to a resident's "assumption of risk" that a guest who is obnoxious to her may be admitted by a co-occupant. *Id.* This notion, observed the Court, is concordant with the significant role that widely shared social expectations play in evaluating the reasonableness of consent searches. *Id.* at 111–12.

¶20 A couple of decades later, the Court applied *Matlock* in *Illinois v. Rodriguez*, 497 U.S. 177 (1990). In *Rodriguez*, Fischer, a woman who showed signs of a severe beating, told police officers that Rodriguez had assaulted her in "our" apartment (where she had clothes and furniture), that he was asleep in the apartment, and that she was willing to take them there in order to unlock the door with her key so that they could arrest him. *Id.* at 179. The officers followed Fischer to the apartment and, without knocking, entered after she unlocked the door and allowed them inside. *Id.* at 180. They proceeded to the bedroom, where they woke Rodriguez up and arrested him. *Id.* In plain view in the apartment, they saw contraband, which they collected and which prosecutors later used to charge Rodriguez with possession of a controlled substance with intent to deliver. *Id.* Before trial, Rodriguez sought to suppress the evidence seized from the apartment. *Id.* To that end, he showed that Fischer lacked authority to consent to the officers' entry because she was no longer living in the apartment at that time. *Id.* The circuit court granted his motion and the appellate court upheld the ruling. *Id.*

¶21     As in *Matlock*, the Supreme Court reversed. *Id.* at 189. It held that if the officers reasonably believed that Fischer lived in the apartment and had common authority over it, her apparent authority sufficed and the warrantless entry was lawful. *Id.* at 183–84, 189. It thus remanded the matter so that the circuit court could consider whether the officers reasonably believed that Fischer had authority to consent. *Id.* at 189.

¶22     In 2006, *Randolph* required the Court to assay the relevant legal landscape when a physically present resident objected to a search but his co-occupant contemporaneously provided consent. *See Randolph*, 547 U.S. at 106. In that case, police officers responded to the Randolph residence after Mrs. Randolph reported a domestic dispute. *Id.* at 107. When the officers arrived, she informed them that her estranged husband was a cocaine user and that there were "items of drug evidence" in the house. *Id.* The officers asked Mr. Randolph for permission to search the house, but he unequivocally refused. *Id.* They then turned to Mrs. Randolph and asked for her consent to search, which she provided without delay. *Id.* A subsequent search revealed evidence that was eventually used to convict Mr. Randolph of possession of cocaine. *Id.*

¶23     On appeal, the Supreme Court explained that the issue of whether Mrs. Randolph had the right to admit the officers despite Mr. Randolph being physically present and objecting turned on "whether customary social

12

understanding accord[ed] the consenting tenant authority powerful enough to prevail over the co-tenant's objection"—a question left unanswered by *Matlock*. *Id.* at 121. Although continuing to recognize the rule shepherded by *Matlock* and reaffirmed in *Rodriguez*—that the police may generally search a jointly occupied residence if one of the occupants consents—the Court created a narrow exception: "[A] physically present inhabitant's express refusal of consent to a police search [of his residence] is dispositive as to him, regardless of the consent of a fellow occupant." *Id.* at 122–23. The Court thus concluded that Mr. Randolph's "stated refusal to permit entry prevail[ed]" over his wife's consent, "rendering the warrantless search unreasonable and invalid as to him." *Id.* at 106.

¶24 The *Randolph* Court explicitly acknowledged that in order to avoid undercutting *Matlock* and *Rodriguez*, it had to draw "a fine line." *Id.* at 121. After all, noted the Court, while Matlock was not physically present on the premises with the opportunity to object when Graff gave officers her consent, he was sitting in a nearby police car; and, though Rodriguez was asleep in his apartment, the officers easily could have awakened him by knocking on the front door before entering pursuant to Fischer's consent. *Id.* Here is the line the Court drew in order to avert overturning *Matlock* and *Rodriguez*:

> [I]f a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.

*Id.*

¶25 The Court unapologetically conceded that this was a "formalis[tic]" line. *Id.* But it reasoned that such a line was justified. *Id.* It pointed to the "practical value" that exists "in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it." *Id.* at 121–22. Then, harkening back to its rationale in *Rodriguez* — that it was "unjustifiably impractical" to require officers "to take affirmative steps to confirm the actual authority" of a co-tenant with apparent authority — the Court decided that it was "[b]etter to accept the formalism of distinguishing *Matlock*" than to "needlessly limit the capacity" of officers "to respond to ostensibly legitimate opportunities in the field" by requiring them "to take affirmative steps to find a potentially objecting co-tenant before acting on the permission . . . already received." *Id.* at 122.

¶26 Recently, the Court had occasion to revisit the *Randolph* exception, this time to consider if it applied where the defendant was initially present on the premises and objected to the police entering his apartment but neither was present nor objected when his co-occupant subsequently consented to a search. *Fernandez*,

14

571 U.S. at 294. In *Fernandez*, police officers responded to a report of a street robbery with a knife. *Id.* at 295. While officers were on scene, a witness pointed out an apartment building to them and told them that "the guy" was in there. *Id.* The officers then saw a man run through an alley and into that building. *Id.* Just a minute or two later, they heard sounds consistent with screaming and fighting coming from one of the apartment units in the building. *Id.* The officers knocked on the door of that apartment unit and a woman named Rojas answered. *Id.* She was holding a baby, appeared to be crying, had a large bump on her nose, redness on her face, and blood on her shirt and hand from what seemed to be a fresh injury. *Id.* Rojas indicated that she had been in a fight. *Id.* When the officers asked if anyone else was in the apartment, she responded that her four-year-old son was the only other person there. *Id.* As the officers asked Rojas to exit the apartment so that they could conduct a protective sweep, Fernandez emerged from inside and addressed the officers: "You don't have any right to come in here. I know my rights." *Id.* at 296. Because the officers suspected that he had assaulted Rojas, they removed him from the apartment and arrested him. *Id.*

¶27 Shortly thereafter, the victim of the street robbery identified Fernandez as his attacker and Fernandez was then transported to the police station. *Id.* About an hour after Fernandez's removal from the apartment, a detective sought and received oral and written consent from Rojas to search the apartment. *Id.* During

15

the search, the officers seized evidence that was later used against Fernandez to obtain convictions at trial for robbery and infliction of corporal injury. *Id.* at 296–97.

¶28 On appeal, Fernandez invoked the *Randolph* exception. *Id.* at 301–02. But the Supreme Court was unpersuaded because he neither was physically present nor objected when the officers requested and Rojas provided consent to search the apartment. *Id.* at 302–06.

¶29 In terms of the physical presence requirement, the Court mentioned that *Randolph* went "to great lengths to make clear that its holding was limited to situations in which the objecting occupant is present." *Id.* at 301. The Court noted that *Randolph* emphasized "this controlling factor" "[a]gain and again." *Id.* In fact, stated the Court, *Randolph* "could hardly have been clearer on this point." *Id.*

¶30 Notably, the Court in *Fernandez* clarified that the requirement of physical presence is not restricted to presence at "the threshold" of the residence, *id.* at 304; it refers instead to "presence on the premises to be searched," *id.* at 306. This clarification notwithstanding, the Court admitted that the physical presence requirement is not without risk of ambiguity because there may be cases in which the parties dispute the outer boundary of the premises. *Id.* But the Court nevertheless remained faithful to the line drawn in *Randolph*. *Id.* Rather than stray off the path mapped by *Randolph*, the Court followed in the footsteps of *Bailey v.*

*United States*, 568 U.S. 186 (2013), which faced a similar challenge in a different context and embraced "a rule that applies only when the affected individual is near the premises being searched." *Fernandez*, 571 U.S. at 306.[6]

¶31 Turning to Fernandez's assertions, the Court disagreed that his absence when Rojas provided consent should not be held against him because it was caused by the officers when they removed him from the apartment and arrested him. *Id.* at 302. It held that "an occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason." *Id.* at 303. Because it was uncontested that the officers had both probable cause to arrest Fernandez and reasonable grounds to remove him from the residence so that they could speak with Rojas "outside of [his] potentially intimidating presence," the Court saw no need to broaden the *Randolph* exception. *Id.*

¶32 More apropos to the issue here, Fernandez also claimed that he satisfied the contemporaneous objection requirement. *Id.* According to Fernandez, his objection at the threshold of the apartment, before officers initially entered,

---

[6] The issue in *Bailey* was whether Bailey's seizure was reasonable, considering that "he was stopped and detained at some distance away from the premises to be searched when the only justification for the detention was to ensure the safety and efficacy of the search" of the premises. 568 U.S. at 189–90.

remained effective when Rojas provided consent to search approximately an hour later. *Id.* In fact, Fernandez asserted that his objection was effective unless he withdrew it. *Id.* For two reasons, the Court was unmoved.

¶33 First, the Court determined that Fernandez's position could not be reconciled with the "widely shared social expectations" or "customary social usage" upon which *Randolph* is rooted. *Id.* (quoting *Randolph*, 547 U.S. at 111, 121). To illustrate the point, the Court took a page out of *Randolph* and contrasted two hypothetical factual scenarios:

> When the objecting occupant is standing at the threshold saying "stay out," a friend or visitor invited to enter by another occupant can expect at best an uncomfortable scene and at worst violence if he or she tries to brush past the objector. But when the objector is not on the scene (and especially when it is known that the objector will not return during the course of the visit), the friend or visitor is much more likely to accept the invitation to enter.

*Id.* at 304. The Court impliedly determined that since Fernandez had not objected at the time officers requested and Rojas granted consent to search, the *Randolph* exception did not apply. *See id.*

¶34 Second, the Court discerned that Fernandez's stance would lead to the very types of practical and administrative complications that *Randolph* specifically attempted to ward off. *Id.* Among the plethora of difficulties the Court anticipated were the following:

- The indefinite duration of an objection if no withdrawal is ever uttered would be problematic. And requiring that an objection remain effective

for a "reasonable" time would not solve the problem. What would be "reasonable"?

- The police and the courts would have to decide whether an objector continues to have "common authority" over the premises even if, after incarceration, he stops paying rent or is no longer on the lease.

- How would a continuing objection be registered? Could an objection be made preemptively in advance or posted in front of the house?

- Which police officers would be bound by an objection?

*Id.* at 304–06. But, concluded the Court, "all of these problems disappear" if we take "*Randolph* . . . at its word" and apply it "only when the objector is standing in the door saying 'stay out' when officers propose to make a consent search." *Id.* at 306.

## C

¶35 Mr. Williams urges us to hold that after *Fernandez*, the *Randolph* exception applies if the objector was "present on the premises," even if he was not actually at the threshold of the residence. Although we agree that the requirement of physical presence refers to being present on the premises—whether at the threshold of the premises, elsewhere on the premises, or near the premises—Mr. Williams's reading of *Fernandez* is incomplete and thus incorrect. *Randolph*'s narrow exception applies only if two requirements are satisfied: (1) the objecting occupant must have been physically present on the premises as officers "propose[d] to make a consent search"; and (2) the objecting occupant must have

19

objected as officers "propose[d] to make a consent search."  *Fernandez*, 571 U.S. at

306; *see also id.* at 294 (framing the issue as "whether *Randolph* applies if the

objecting occupant is absent *when another occupant consents*" (emphasis added)); *id.*

at 301 ("In this case, [Fernandez] was not present *when Rojas consented . . . .*"

(emphasis added)); *id.* at 296, 301–02 (characterizing as unsound Fernandez's

assertion "that it was sufficient that he objected to the search while he was still

present," which occurred approximately an hour before Rojas provided officers

consent).  In other words, both of the requirements that the objecting occupant

must fulfill are anchored to the timeframe during which police officers request and

receive a co-occupant's consent to search.

¶36     In the vast majority of cases, the colloquy between the police and an

objector's co-occupant regarding consent to search will take place at the threshold

of the residence.  Not surprisingly, then, *Randolph* alluded to the objecting

occupant standing at the threshold saying "stay out."  547 U.S. at 113.  And, while

*Fernandez* clarified that the requirement of physical presence is not limited to

presence at the threshold, we do not read that opinion as dispensing with the

contemporaneous objection requirement. The objecting occupant must still speak

up and object as a co-occupant grants officers consent to search.  Otherwise, the

Court would have reached the opposite result in *Fernandez*.  Fernandez was

physically present and objected—at the threshold of his apartment no less—when

officers first arrived. But the Court nevertheless refused to extend the *Randolph* exception because Fernandez neither was physically present on the premises nor objected as officers and Rojas had a colloquy regarding consent to search (wherever on the premises that colloquy may have taken place).

¶37 Whereas Fernandez objected *before* Rojas gave officers consent to search, we deal here with the other side of the picture because Mr. Williams objected *after* his wife gave officers consent and invited them inside so that they could take possession of the drugs and paraphernalia. For reasons similar to those articulated by the Court in *Fernandez*, we decline to stretch the *Randolph* exception to cover this situation.

¶38 First, the application of *Randolph* in this case is not compatible with the "widely shared social expectations" or "customary social usage" in which that decision is embedded. When the officers arrived at the Williams residence and Mrs. Williams invited them in, no "fellow tenant stood there saying, 'stay out.'" *Randolph*, 547 U.S. at 113. Under these circumstances, a friend or visitor would have likely accepted the invitation to enter, as he or she would have had no reason to expect "an uncomfortable scene," much less "violence." *Fernandez*, 571 U.S. at 303–04.

¶39 Mr. Williams insists, though, that "[n]o sensible person" would have felt "confident to remain" in his residence in the face of his "command to 'get out.'"

21

However, this contention misses the mark because it mistakenly focuses on the moment the officers contacted him in the living room, as opposed to the moment his wife provided consent and permitted them to enter the residence. The inquiry is whether, at the time Mrs. Williams provided consent and allowed the officers inside the residence, "a caller" standing in their shoes "would have [had] no confidence" that the invitation "was a sufficiently good reason to enter." *Randolph*, 547 U.S. at 113. To make the focal point of the analysis the subsequent interaction between the officers and Mr. Williams would allow the exception to swallow the rule whenever the objecting occupant is simply present on the premises. Put differently, it would eliminate the requirement that the objecting occupant must object as officers request and the co-occupant grants consent to search.

¶40 Second, the rule for which Mr. Williams advocates would bring about myriad practical problems. For example:

- How long after officers enter a residence pursuant to an occupant's consent could a co-occupant revoke that consent? Requiring an occupant to revoke a co-occupant's consent within a "reasonable" time would not solve the problem. What would be "reasonable"?

- Would it make a difference if, at the time of the revocation, officers have started searching the residence? And, if they have already recovered something incriminating, would they have to stop or could they continue their search or obtain a search warrant?

- Would the exclusionary rule apply to items collected before the revocation? Would it apply to plain view observations already made? Would it apply to evidence derived from those items or observations?

22

- Finally, would the proposed rule cause officers to rush and to be less cautious while conducting consent searches for fear that a co-occupant could show up at any moment and revoke the consent provided?

¶41 Of course, to borrow from *Fernandez*, "all of these problems disappear" if we take *Randolph* at its word. *Fernandez*, 571 U.S. at 306. Because we do, we hold that the *Randolph* exception, as clarified in *Fernandez*, applies only if, at the time the officers receive an occupant's consent to search, a co-occupant who is physically present on the premises objects.[7]

¶42 In this case, Mr. Williams was physically present on the premises when the officers arrived and Mrs. Williams invited them inside to collect the drugs and paraphernalia she had hidden in the garage. However, he did not object at that time. Therefore, the *Randolph* exception does not apply. Mr. Williams's subsequent objection, after the officers had already entered his home and were in the process of taking possession of the drugs and paraphernalia, could not vitiate the consent previously provided by his wife.

---

[7] We recognize that Mrs. Williams initially consented at the church when she met with the officers in Mr. Williams's absence. Today's decision is not grounded in Mr. Williams's failure to object during that colloquy or sometime before the officers arrived at his home. Mrs. Williams could have changed her mind and taken back her consent before she returned home. She did not do so. Instead, she continued to consent and, upon reaching her residence, invited the officers to cross the threshold of her home and enter. Had Mr. Williams stood at the door and said "stay out" or otherwise objected to the officers' entry, we would find that the *Randolph* exception applies.

## III

¶43   We conclude that the division correctly upheld the district court's suppression order.  However, because our rationale differs from the division's, we affirm on other grounds.