The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
March 12, 2020

## 2020COA40

## No. 17CA1138, *People v. Cattaneo*— Constitutional Law — Fourth Amendment — Searches and Seizures

A division of the court of appeals considers whether police

agents' efforts to obtain a parked car's vehicle identification number

(VIN) violated the defendant's Fourth Amendment rights. The

agents reasonably suspected that the car was stolen but could not

confirm or dispel that suspicion by reading the VIN on the

dashboard because it was obscured. The agents then directed the

defendant to unlock the car so they could open the door to view the

VIN on the doorjamb. The division concludes that, under these

circumstances, probable cause to search the car was not required.

Because the agents' actions did not exceed the bounds of an

investigatory stop, and because the defendant did not have a

reasonable expectation of privacy in the VIN, the division holds that the agents' actions were justified.

The division also concludes that the trial court's belated imposition of a drug surcharge did not violate the defendant's double jeopardy rights because the initial sentence that omitted the surcharge was illegal. Therefore, correcting the initial sentence to add the surcharge was proper.

Judge Dailey concurs as to the Fourth Amendment issue but dissents on the double jeopardy issue. He concludes that, because the trial court did not impose the surcharge at sentencing, and the absence of the surcharge did not render the sentence illegal, the court's later imposition of the surcharge violated the defendant's double jeopardy rights.

Court of Appeals No. 17CA1138
Jefferson County District Court No. 16CR30
Honorable Christopher C. Zenisek, Judge
Honorable Philip J. McNulty, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Nicholas Trenton Cattaneo,

Defendant-Appellant.

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE NAVARRO
Miller*, J., concurs
Dailey, J., concurs in part and dissents in part

Announced March 12, 2020

Philip J. Weiser, Attorney General, Elizabeth Ford Milani, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Meredith Rose, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2019.

¶ 1    In this appeal, we consider whether police agents' actions to obtain a parked car's vehicle identification number (VIN) based on reasonable suspicion that the car had been stolen violated the Fourth Amendment right of defendant, Nicholas Trenton Cattaneo, to be free from unreasonable searches and seizures.  We conclude that, under the circumstances, probable cause to search the car was not required and the agents' actions were justified.  Therefore, the trial court properly denied Cattaneo's motion to suppress evidence discovered upon his subsequent arrest for motor vehicle theft.

¶ 2    We also consider whether the trial court's imposition of a drug surcharge after the sentencing hearing violated Cattaneo's double jeopardy rights.  We find no double jeopardy violation, but we remand to provide Cattaneo an opportunity to prove his inability to pay the surcharge.  In sum, we affirm the judgment and remand for further proceedings.

I.    Factual and Procedural History

¶ 3    Police Agent Rob Albrets responded to a call that employees of a Walmart store had detained Cattaneo on suspicion of shoplifting.  When Agent Albrets arrived at the store's loss prevention office, he

1

arrested Cattaneo. A subsequent search revealed keys to a Lincoln sedan and over $2000 in cash, but no personal identification (ID).

¶ 4 Per his department's procedures, Agent Albrets planned to release Cattaneo on a summons, but that was possible only if Cattaneo had ID. Cattaneo said his ID was in the car, and he gave Agent Albrets permission to use his key fob to enter the car and retrieve the ID from the center console.

¶ 5 Agent Albrets found the Lincoln backed into a parking spot against a fence. It had a temporary tag in place of the rear license plate and no front plate. The agent's call to police dispatch revealed that the temporary tag was associated with a dealership but not a specific vehicle. The agent unlocked the car, opened the center console, found the ID, and closed up and locked the car.

¶ 6 Suspecting that the car might have been stolen, Agent Albrets called for assistance to determine whether it was stolen, and he returned to the loss prevention office. In response, Agent Sean Radke arrived at the parking lot and attempted to find the car's VIN by looking at the dashboard through the windows. The VIN was obscured, however, by a crumpled paper that Agent Radke believed had been intentionally shoved into the dashboard to hide the VIN.

¶ 7        Meanwhile, Agent Albrets released Cattaneo from the loss prevention office but followed him (at a distance) to his car, where Agent Radke was waiting.  As Agent Radke approached, Cattaneo walked quickly to the car's passenger side, removed a backpack from the car, and locked the car.  Fearing that Cattaneo might be grabbing a weapon, and wishing to investigate if the car had been stolen, Agent Radke "separated" Cattaneo from the backpack.[1] Agent Radke explained that he wanted to find the VIN.  Because Cattaneo had the keys, Agent Radke asked him to open the door so the agent could see the VIN on the car door.  Apparently, the agent also said that he had the right to call a locksmith to open the car to access the VIN, although the record is less than clear on this point. Agent Radke did not inform Cattaneo that he could refuse a request to search the car.  *See* § 16-3-310, C.R.S. 2019.

¶ 8        Cattaneo used his key fob to unlock the car.  Agent Radke opened the door, located the VIN on the doorjamb, and closed the door without entering the passenger compartment.  Agent Radke asked dispatch to check the VIN.  Within two minutes, dispatch

---

[1] The record does not make clear whether Agent Radke physically took the backpack or simply directed Cattaneo to put it down.

3

responded that the car had been reported stolen.  The agents arrested Cattaneo on suspicion of motor vehicle theft and searched the backpack, where they found a large number of OxyContin and Oxycodone pills.

¶ 9    The prosecution charged Cattaneo with aggravated motor vehicle theft, possession with intent to manufacture or distribute a controlled substance, possession of a controlled substance, and theft of less than fifty dollars.

¶ 10    Before trial, Cattaneo moved to suppress the pills as fruit of an unlawful search.  He contended that the agents did not have probable cause to search the car and did not obtain his voluntary consent to open the car door to access the VIN, without which they would not have had probable cause to arrest him and search the backpack.  The prosecution countered that the agents suspected that the vehicle was stolen, the search was limited in scope, and Cattaneo's consent was voluntary even absent the statutory advisement.

¶ 11    The trial court denied the motion to suppress.  It found that the agents had reasonable suspicion that the vehicle was stolen and that they obtained the VIN through a reasonable and limited

4

search. Moreover, the trial court found that Cattaneo had voluntarily consented to a search of the car to obtain the VIN. The court concluded that, once the VIN showed the car to be stolen, the agents had probable cause to arrest Cattaneo and the pills were admissible as the result of a valid search incident to arrest, an inventory search, or inevitable discovery.

¶ 12 The case proceeded to trial. The prosecution ultimately dismissed the motor vehicle theft charge, and the jury convicted Cattaneo of the remaining charges. The trial court sentenced him to a term of imprisonment and parole. Additionally, the mittimus appears to require him to pay a drug surcharge.

## II.    Suppression Order

¶ 13 Everyone agrees that Cattaneo's arrest on suspicion of stealing the car, and the subsequent discovery of illicit drugs in his backpack, resulted from the police agents' obtaining the VIN from the car's doorjamb. Cattaneo contends, as he did in the trial court, that the agents could not search his car without probable cause or his voluntary consent to search. According to him, the agents had neither. Alternatively, Cattaneo also argues, for the first time on appeal, that the seizure of the car and his person in the parking lot

was illegal because it was not supported by probable cause. On this latter theory, he concludes that the backpack's contents were the ultimate fruit of an illegal seizure.

¶ 14 We disagree because the police agents' actions were reasonable under the totality of the circumstances. Specifically, the limited intrusion into the car to view the VIN and the earlier seizure of Cattaneo and the vehicle were within the permissible scope of an investigatory stop justified by reasonable suspicion that the car was stolen.

### A. Standard of Review and General Principles

¶ 15 Appellate courts apply a mixed standard of review to suppression issues. *People v. Chavez-Barragan*, 2016 CO 66, ¶ 34. "Under this standard, we review the trial court's findings of historic fact deferentially, accepting them if they are supported by competent record evidence . . . ." *Id.* But we review de novo the legal effect of those facts. *Williams v. People*, 2019 CO 108, ¶ 14.

¶ 16 Where a defendant failed to preserve his suppression arguments in the trial court, we may reverse based on those arguments only if plain error occurred. *See Phillips v. People*, 2019 CO 72, ¶¶ 22-38. "[P]lain error occurs when there is (1) an error,

(2) that is obvious, and (3) that so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Id.* at ¶ 39.

¶ 17  Both the Fourth Amendment of the United States Constitution and article II, section 7 of the Colorado Constitution prohibit unreasonable searches and seizures. *People v. Allen*, 2019 CO 88, ¶ 15. A warrantless search or seizure is presumptively unreasonable and therefore unconstitutional. *Id.* Because "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" however, the warrant requirement is subject to exceptions. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). The prosecution bears the burden to establish that a warrantless search falls within an exception to the warrant requirement. *Allen*, ¶ 16.

¶ 18  One such exception is an investigatory stop based on less than probable cause. *People v. Rodriguez*, 945 P.2d 1351, 1359 (Colo. 1997). "An officer may engage in an investigatory stop of a car and then question the driver without running afoul of the Fourth Amendment's prohibition against unreasonable searches and seizures provided three conditions exist:" (1) the officer has reasonable suspicion that criminal activity has occurred, is taking

7

place, or is about to take place; (2) the officer has a reasonable objective for the stop; and (3) the scope and character of the intrusion is reasonably connected to its objective. *Id.*

### B. Seizure of Cattaneo and the Car

¶ 19 The parties here do not dispute that the agents had reasonable suspicion to believe the car was stolen. Cattaneo had just been detained for shoplifting. He had the keys to a vehicle that lacked a front license plate. The temporary tag in the rear was associated only with a dealership, and the car was parked in manner that obscured the rear plate. The VIN on the dashboard appeared purposefully obscured. Agent Radke testified that, in his experience, the combination of these facts indicated that the car was stolen. We therefore agree with the parties and the trial court that the agents reasonably suspected that the vehicle had been stolen. *Id.* (The pertinent question is "whether, under the totality of the circumstances, the 'specific and articulable facts' known to the officer at the time of the encounter and the rational inferences from these facts create a 'reasonable suspicion of criminal activity . . . .'" (quoting *People v. Thomas*, 660 P.2d 1272, 1274 (Colo. 1983))).

¶ 20    To confirm or dispel their suspicion, the agents detained the car and Cattaneo for the purpose of checking the VIN to determine if the vehicle had been reported stolen. Because one function of the VIN is to "to assist law enforcement officers in recovering stolen vehicles," we conclude that the agents' objective to obtain the VIN was reasonable. *Id.* at 1361.

¶ 21    Turning to the scope of the stop, courts consider a nonexhaustive list of factors, including the following: (1) the length of the detention; (2) whether the officer diligently pursued the basis for the initial stop; (3) whether the suspect was required to move from one location to another; and (4) whether there were alternative, less intrusive means available. *Chavez-Barragan,* ¶ 22. In addition, courts often consider the degree of force used. *Id.* at ¶ 23.

¶ 22    For purposes of analysis, we accept Cattaneo's view that the stop — the seizure of Cattaneo and his car — began when the agents separated him from his backpack and his car for the purpose of checking the VIN. We also assume that Agent Radke asked Cattaneo to unlock the car so the agent could obtain the VIN but also told him that, if he did not, a locksmith would do so.

Agent Radke also asked Agent Albrets to watch Cattaneo while Agent Radke obtained the VIN. Altogether, such conduct amounted to a seizure because a reasonable person would not feel free to terminate the encounter with the agents. *See People v. Fines*, 127 P.3d 79, 81 (Colo. 2006) (a reasonable person would not feel free to terminate an encounter where officers separated her from her vehicle and remained in control of her purse).

¶ 23    The length of the stop was merely the amount of time the agents needed to find and run the VIN, which was only a few minutes. *Cf. Rodriguez*, 945 P.2d at 1362-63 (ninety minutes to obtain VIN during traffic stop was unreasonable). During that short time, the agents diligently pursued their objective. They did not require Cattaneo to relocate himself or the car. *Cf. id.* (requiring driver to travel ten miles to police station was unreasonable).

¶ 24    As for possible alternatives, the officers employed the least intrusive means available to obtain the VIN. The officers attempted to investigate whether the car was stolen by first checking the rear license plate, which indicated that it was not associated with a particular person. They then attempted to obtain a VIN with a plain view investigation, only to discover that the dashboard VIN was

obstructed. When those measures did not assuage their suspicion, they did not forcibly enter the vehicle. Rather, they waited for Cattaneo to return to the car and asked him to unlock it so they could inspect the VIN.[2] After Cattaneo unlocked the car, Agent Radke opened the door and remained outside the car while he found the VIN on the exposed doorjamb. He did not intrude into the passenger compartment.

¶ 25     Overall, then, the scope and character of the agents' actions were reasonably connected to the stop's objective. We thus reject Cattaneo's view that the seizure of the car required probable cause. Where the seizure of property is minimally intrusive, police may temporarily seize it for purposes of investigation based on less than probable cause. *People v. Tallent*, 174 P.3d 310, 313 (Colo. 2008).

¶ 26     We likewise disagree with Cattaneo that he was essentially placed under arrest. A seizure that occurs within the bounds of an investigatory stop is not an arrest. *Terry v. Ohio*, 392 U.S. 1, 27

---

[2] Cattaneo relies on the United States Supreme Court's statement that, if property is temporarily detained for an investigative purpose that "is itself a search requiring probable cause," the initial seizure must be justified by probable cause. *United States v. Place*, 462 U.S. 696, 706 (1983). As we will explain, however, the agents' action to obtain the VIN was not itself a search requiring probable cause under the circumstances of this case.

(1968).  As noted, the detention was brief.  Agent Radke did no more than necessary to ensure the agents' safety during the investigation.  Based on Cattaneo's quick pace to the car and sudden grabbing of the backpack from the car, Agent Radke was reasonably concerned that the backpack might contain a weapon.  Separating him from the backpack was a minimally intrusive measure given the concern for officer safety.  *People v. Smith*, 13 P.3d 300, 305 (Colo. 2000) ("[D]uring an investigatory stop, an officer may take steps to ensure his own safety.").  And, because Cattaneo was not restrained, Agent Radke's instruction to Agent Albrets to "watch" Cattaneo (and thus to keep him separated from the backpack and car) was a reasonable precaution.  The detention did not involve physical restraints, and the entire investigation took place in public.  These measures were certainly less intrusive than, for instance, handcuffing him in the police cruiser for the duration of the stop.  *Cf. id.* at 305-06 (where officers had legitimate safety concerns, handcuffing a suspect and ordering him to lay prone did not exceed the scope of an investigatory stop).

¶ 27     Under these circumstances, a reasonable person would expect that the brief encounter would end as soon as the agents ran the

VIN. *Cf. People v. Cervantes-Arredondo*, 17 P.3d 141, 146 (Colo. 2001) ("A seizure is an arrest if a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement to the degree associated with formal arrest."). Because "a prudent officer acting with sufficient reasonable suspicion to believe criminal activity is afoot may temporarily detain persons or property without probable cause," we conclude that the seizure here did not escalate to an arrest. *Tallent*, 174 P.3d at 314.

¶ 28 In any event, the trial court surely did not commit obvious error by failing to rule, sua sponte, that the detention of Cattaneo or the car was illegal. Hence, the court did not commit plain error. *See Scott v. People*, 2017 CO 16, ¶ 16 ("To qualify as plain error, an error must generally be so obvious that a trial judge should be able to avoid it without the benefit of an objection.").

### C. Inspection of the VIN

¶ 29 Furthermore, under the facts in this case, we are not persuaded that the police agent needed probable cause to (1) ask Cattaneo to unlock the car and then (2) open the door for the sole purpose of inspecting the VIN in the doorjamb.

¶ 30    The United States Supreme Court has explained that "[t]he VIN is a significant thread in the web of regulation of the automobile." *New York v. Class*, 475 U.S. 106, 111 (1986). The VIN allows the easy identification of a particular vehicle, which assists governments in many ways. *Id.* For instance, "[b]y making automobile theft more difficult, the VIN safeguards not only property but also life and limb." *Id.* In light of the important interests served by the VIN, "the Federal and State Governments are amply justified in making it a part of the web of pervasive regulation that surrounds the automobile." *Id.* at 112. As relevant here, the VIN is required by law to be placed in the doorjamb and on the dashboard where it is readable by an observer located outside the vehicle. *See Rodriguez*, 945 P.2d at 1361; 49 C.F.R. § 541.5 (2019); 49 C.F.R. § 565.13(f) (2019). An express legislative purpose of this requirement is to assist law enforcement officers in recovering stolen vehicles. *See Rodriguez*, 945 P.2d at 1361.

¶ 31    Because of the extensive regulation of vehicles, a person "must surely expect that such regulation will on occasion require the State to determine the VIN of his or her vehicle, and the individual's reasonable expectation of privacy in the VIN is thereby diminished."

*Class*, 475 U.S. at 113.  Indeed, "it is unreasonable to have an expectation of privacy in an object required by law" to be placed "in plain view from the exterior of the automobile."  *Id.* at 114.  Therefore, the Supreme Court has held that there is no reasonable expectation of privacy in a VIN located "either inside the doorjamb, or atop the dashboard."  *Id.* at 118-19 (distinguishing between checking the doorjamb and intruding into the vehicle's interior).

¶ 32    Even so, Cattaneo argues that the warrantless inspection of the VIN in the doorjamb was a search requiring probable cause or his consent.  The People, noting that Cattaneo had no reasonable expectation of privacy in the VIN in the doorjamb, contend that inspecting the VIN was not a search under the Fourth Amendment.  As a result, the People continue, the police agents needed no cause at all to inspect the VIN.  We need not, and do not, go so far because we are persuaded by the People's alternative argument.  Assuming, without deciding, that the agent's opening the car door to inspect the VIN in the doorjamb (after asking Cattaneo to unlock the door) constituted a search, we conclude that the search was justified by reasonable suspicion that the car was stolen, did not

15

exceed the bounds of an investigatory stop, and was therefore reasonable.

¶ 33    We draw further guidance from the *Class* decision.  There, an officer conducted a traffic stop of the defendant, who then spontaneously exited the vehicle.  Without asking the defendant's permission, a second officer opened the car door to look for the VIN in the doorjamb.  Unable to find it there, he reached into the car's interior to move papers obscuring the area of the dashboard where the VIN was required to be.  When reaching in, he noticed a gun protruding from under the driver's seat.  On that basis, he arrested the defendant.  *See Class*, 475 U.S. at 108.

¶ 34    After finding that the defendant did not have a reasonable expectation of privacy in the VIN, the Court concluded that "[t]he mere viewing of the formerly obscured VIN" on the dashboard was not a search and did not violate the Fourth Amendment.  *Id.* at 113-14.  The Court decided, however, that the officer's reaching into the car's interior to move the papers on the dashboard constituted a search.  *Id.* at 114-15.

¶ 35    The Court then considered whether the officer's actions were reasonable.  *Id.* at 118-19.  In doing so, it did not ask whether the

16

officer had probable cause to search the vehicle.  Instead, the Court balanced the "nature and quality" of the intrusion against the importance of the governmental interest justifying the intrusion.  *Id.* at 118-19 (quoting *Place*, 462 U.S. at 703).  The Court acknowledged that the police had no reason to suspect that the defendant's car was stolen.  *Id.* at 108.  Nonetheless, the Court concluded that the search for the VIN was reasonable given that the police had observed the defendant commit two traffic violations and given the typical circumstances of a traffic stop (including an officer's authority to remove the driver from the vehicle for safety purposes).  *Id.* at 117-18.  Also critical to the Court's decision was the fact that the officer's actions were minimally intrusive.  The officer looked for the VIN only in the doorjamb and on the dashboard; "[n]either of those locations is subject to a reasonable expectation of privacy."  *Id.* at 118.  The officer did not root around in the car's interior or reach into any compartments.  Considering all the circumstances, the Court found no Fourth Amendment violation.  *Id.* at 118-19.[3]

---

[3] The Court noted that its holding did not authorize police officers to enter a vehicle's passenger compartment to obtain a dashboard-

¶ 36    The inspection here was less intrusive than the search in *Class.*  Agent Radke did not intrude into the car's interior but only checked the doorjamb for the VIN.  *Cf. id.*  Given his reasonable suspicion that the car was stolen, and given that Cattaneo did not have a reasonable expectation of privacy in the doorjamb VIN, this very limited intrusion was reasonable under *Class.*

¶ 37    Indeed, Cattaneo does not argue that the *Class* Court required probable cause to justify the search in that case.  Instead, he says that *Class* does not apply because the car here was not stopped due to a traffic violation; it was parked in a lot.  *See United States v. $277,000.00 U.S. Currency,* 941 F.2d 898, 902 (9th Cir. 1991) (holding that removing an opaque car cover to inspect a parked car's dashboard VIN was a search requiring probable cause).  Cattaneo warns against applying *Class* to permit a search of *any* parked car without probable cause simply because the dashboard VIN is obscured in some way.  Our holding, however, does not sweep so broadly.

---

mounted VIN when the VIN is visible from outside the vehicle.  *New York v. Class,* 475 U.S. 106, 119 (1986).

18

¶ 38     We hold merely that the agent's reasonable suspicion that the car was stolen in this case provided sufficient justification for the momentary inspection of the VIN in the doorjamb.  While we recognize that the *Class* Court analyzed the circumstances of the traffic stop in that case, we do not read *Class* as applying only to traffic stops.  The Court discussed the police's authority to check a VIN during traffic stops only after the Court noted that the police there had no reason to suspect the car was stolen.  In contrast, the agent here had such a reasonable suspicion and conducted a lawful investigatory stop.  Given the VIN's importance in assisting police to recover stolen vehicles, we see no reason to limit *Class*'s rationale to traffic stops and to refuse to apply *Class* to other lawful seizures of vehicles.  After all, the government's interests in regulating vehicles do not disappear altogether once a vehicle is parked.  Officers maintain an interest in returning stolen vehicles to their owners and conducting their investigations in a safe manner.  *Cf*. 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.5(d) (5th ed. 2019) ("Whether there must always be an observed traffic violation on which to 'piggy-back' the VIN search is unclear, though the Court's statements [in *Class*] about the importance of

the VIN and the consequent lack of an expectation of privacy as to the VIN would lend support to the conclusion . . . that checking in a vehicle for a VIN is a lesser intrusion than the usual search and thus may be undertaken upon a lesser quantum of evidence.") (footnotes omitted).

¶ 39 To sum up, in all Fourth Amendment inquiries, the ultimate question is reasonableness. *Brigham City*, 547 U.S. at 403. If a Fourth Amendment search or seizure is a "lesser intrusion," it may be justified by something less than probable cause. *See Delaware v. Prouse*, 440 U.S. 648, 656 (1979); *see also People v. Brown*, 2018 CO 27, ¶ 8 (permitting warrantless search and seizure of vehicles in furtherance of community caretaking functions, without regard to probable cause); *People v. Delacruz*, 2016 CO 76, ¶ 14 (permitting protective sweep of passenger compartment based on reasonable suspicion that motorist is armed and dangerous). One such lesser intrusion is an investigatory stop, and the agent's brief inspection of the VIN in the doorjamb fell within the scope of a valid investigatory stop. Accordingly, the inspection of the VIN did not violate Cattaneo's Fourth Amendment rights.

¶ 40     Because the Fourth Amendment did not require the agent to have probable cause or to obtain Cattaneo's consent before inspecting the VIN in the doorjamb, we need not address whether his consent to the agent's opening the door was voluntary. *See United States v. Knights*, 534 U.S. 112, 118 (2001) (declining to address consent where a search was reasonable). Neither his subsequent arrest for motor vehicle theft nor the search of his backpack was tainted by illegality. The trial court, therefore, properly denied his motion to suppress.

### III.   Double Jeopardy

¶ 41     Cattaneo next contends that the trial court impermissibly increased his sentence when it imposed a drug surcharge on the mittimus without first announcing it in open court at the sentencing hearing.[4] Reviewing de novo whether the court violated Cattaneo's rights against double jeopardy, *see People v. Tillery*, 231 P.3d 36, 48 (Colo. App. 2009), *aff'd sub nom. People v. Simon*, 266 P.3d 1099 (Colo. 2011), we see no double jeopardy violation.

---

[4] The drug surcharge is not specifically enumerated on the mittimus, which mentions only an aggregate amount of money assessed against Cattaneo. But both parties agree that the drug surcharge is included.

¶ 42　　The Double Jeopardy Clauses of the United States and Colorado Constitutions protect a defendant from being twice punished for the same offense.  U.S. Const. amends. V, XIV; Colo. Const. art. II, § 18.  As Cattaneo correctly argues, "increasing a lawful sentence after it has been imposed and the defendant has begun serving it may, in certain circumstances, violate this aspect of double jeopardy protection."  *People v. McQuarrie*, 66 P.3d 181, 182 (Colo. App. 2002).  But when a sentence is illegal, it may be corrected "at any time" without violating double jeopardy — even if the correction increases the sentence — because a defendant has no legitimate expectation of finality in an illegal sentence.  *People v. Wiseman*, 2017 COA 49M, ¶ 28 (quoting Crim. P. 35(a)); *see also Romero v. People*, 179 P.3d 984, 989 (Colo. 2007) ("[D]ouble jeopardy does not bar the imposition of an increased sentence if the defendant lacked a legitimate expectation of finality in the sentence.").

¶ 43　　Thus, the question is whether the initial sentence imposed in open court, which omitted the drug surcharge, was lawful.  We review the legality of a sentence de novo.  *People v. Bassford*, 2014 COA 15, ¶ 20.  "Sentences that are inconsistent with the statutory

22

scheme outlined by the legislature are illegal." *People v. Rockwell,* 125 P.3d 410, 414 (Colo. 2005).

¶ 44    Cattaneo was convicted of two drug felonies, which subjected him to incarceration, parole, and a drug offender surcharge for each conviction. *See* § 18-1.3-401.5, C.R.S. 2019; § 18-18-405(2)(a), C.R.S. 2019; § 18-19-103(1), C.R.S. 2019. The drug offender surcharge was imposed by section 18-19-103(1), which provides that "each drug offender who is convicted . . . shall be required to pay a surcharge." The statute further provides:

> (a) The court may not waive any portion of the surcharge required by this section unless the court first finds that the drug offender is financially unable to pay any portion of said surcharge.
>
> . . . .
>
> (c) The court shall waive only that portion of the surcharge which the court has found the drug offender is financially unable to pay.

§ 18-19-103(6).

¶ 45    Relying on the waiver provision, Cattaneo argues that, "because the drug surcharge is punishment and is not mandatory in all cases," his original sentence imposed in open court was legal. As a result, he concludes that the Double Jeopardy Clause

precluded the court from later imposing the drug surcharge on the mittimus. His conclusion finds support in the division's decision in *McQuarrie*, 66 P.3d at 183. Contrary to Cattaneo's view, however, simply because it is legal not to impose the surcharge in some cases does not necessarily mean that the failure to impose it in *his* case was legal (i.e., consistent with the statutory scheme). *See People v. Yeadon*, 2018 COA 104, ¶¶ 47-51 (disagreeing with *McQuarrie*) (*cert. granted* Mar. 25, 2019).

¶ 46 The imposition of restitution, for example, is not mandatory in every criminal conviction, yet its omission may render a sentence illegal in some cases. *See, e.g.*, *People v. Dunlap*, 222 P.3d 364, 368 (Colo. App. 2009); *People v. Smith*, 121 P.3d 243, 251 (Colo. App. 2005). Specifically, where the trial court's sentence does not impose restitution but fails to include a specific finding that the victim suffered no pecuniary loss, the sentence is illegal. *See Smith*, 121 P.3d at 251; *see also Dunlap*, 222 P.3d at 368. In that scenario, the sentence may be corrected to impose restitution without offending double jeopardy principles. *See Smith*, 121 P.3d at 251.

24

¶ 47    Likewise, the legality of Cattaneo's sentence depends not on whether the drug surcharge may be legally omitted in some cases but on whether the trial court legally omitted the surcharge in this case.  The drug offender surcharge statute provides that it "shall" be imposed in "each" drug conviction.  § 18-19-103(1), (6); *see also Yeadon*, ¶¶ 50-51.  Section 18-19-103(6) provides a mechanism for waiver that is also couched in mandatory language.  The trial court "*may not*" waive the surcharge "*unless* the court first finds" that the offender is financially unable to pay it.  § 18-19-103(6)(a) (emphasis added).  In other words, a trial court's authority to reduce the surcharge is predicated upon the inability-to-pay finding.  Absent such an express finding, the statute requires the trial court to impose the full surcharge.  And, even if the court makes that finding, the statute imposes a further restriction: the court "shall waive *only that portion* of the surcharge which the court *has found* the drug offender is financially unable to pay."  § 18-19-103(6)(c) (emphasis added).

¶ 48    Reading the statute as a whole and giving sensible effect to all its parts, we conclude that a trial court has the authority to reduce or eliminate the surcharge only to the extent the offender is unable

25

to pay it. *See* § 18-19-103(6)(c); *People v. Thames*, 2019 COA 124, ¶ 76 (discussing analogous waiver provisions). This authority does not exist unless the court makes an express finding that the offender is unable to pay all or part of the surcharge. *Cf. Smith*, 121 P.3d at 251. Nowhere does the statute authorize a court to omit the surcharge without the required finding.

¶ 49 Accordingly, where a drug conviction is involved, a sentence is legal only where the trial court (1) makes a specific finding that the offender is unable to pay the full surcharge and waives the surcharge to the extent necessary or (2) imposes the full surcharge. *Yeadon*, ¶¶ 50-51; *see also Thames*, ¶¶ 76-78. Because Cattaneo's original sentence announced in open court omitted the surcharge without a finding that he was unable to pay it, the sentence was contrary to section 18-19-103 and, thus, illegal. *Yeadon*, ¶¶ 50-51; *see also Thames*, ¶¶ 77-78. So, the sentence could be corrected without violating Cattaneo's rights against double jeopardy. *Rockwell*, 125 P.3d at 414; *Wiseman*, ¶¶ 26-28.

¶ 50 In the event we disagree with his double jeopardy argument, Cattaneo requests a remand to give him an opportunity to present evidence of his inability to pay the surcharge. *See* § 18-19-103(6)(b)

(permitting a hearing regarding the offender's financial ability to pay the surcharge). The People do not object to this relief. We therefore remand to the trial court to give Cattaneo an opportunity to show his inability to pay the surcharge. *See Thames*, ¶ 78.

## IV. Conclusion

¶ 51 The judgment is affirmed, but the case is remanded to the trial court to provide Cattaneo the opportunity to prove his inability to pay the drug surcharge.

JUDGE MILLER concurs.

JUDGE DAILEY concurs in part and dissents in part.

JUDGE DAILEY, concurring in part and dissenting in part.

¶ 52     I concur in all parts of the opinion except Part III, where the majority concludes, based on People v. Yeadon, 2018 COA 104 (cert. granted Mar. 25, 2019), that the court was allowed to belatedly impose a drug surcharge and, consequently, did not violate Cattaneo's double jeopardy rights.

¶ 53     Section 18-19-103(1), C.R.S. 2019, provides that "each drug offender who is convicted . . . shall be required to pay a surcharge." The statute also states that "[t]he court may not waive any portion of the surcharge required by this section unless the court first finds that the drug offender is financially unable to pay any portion of said surcharge." § 18-19-103(6)(a).

¶ 54     In People v. McQuarrie, 66 P.3d 181, 183 (Colo. App. 2002), a division of this court concluded that "because the drug offender surcharge is considered punishment and is not mandatory in all cases, the Double Jeopardy Clause required the trial court to impose such a fine at the time that it imposed [the] defendant's sentence in open court," and not later.

¶ 55     I served on the division that decided McQuarrie, and I'm sticking with the position I took in that case. In my view, a statute

28

that, as here, essentially says "a surcharge shall be imposed unless . . . " is not mandatory, and, consequently, the absence of that surcharge does not make a sentence illegal.  Cf. id. (The surcharge "differs from . . . nonwaivable costs, the subsequent imposition of which does not violate double jeopardy principles.").

¶ 56    Because the trial court did not impose the surcharge at sentencing, and the absence of the surcharge did not render the sentence illegal, the court's later imposition of the surcharge violated Cattaneo's double jeopardy rights.